In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1116

ANDRE BROWN,

*Petitioner-Appellant,*

*v.*

DAVE REDNOUR, Warden,
Menard Correctional Center,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 6666—**John W. Darrah**, *Judge.*

ARGUED JANUARY 7, 2011—DECIDED MARCH 25, 2011

Before MANION and WILLIAMS, *Circuit Judges*, and
CLEVERT, *District Judge.**

CLEVERT, *District Judge.* Leon Mayes died from mul-
tiple gunshot wounds shortly after midnight on Octo-

* The Honorable Charles N. Clevert, Jr., Chief Judge of the
United States District Court for the Eastern District of Wis-
consin, sitting by designation.

ber 10, 2000. Andre Brown and Derrick Stevens were charged and found guilty of first-degree murder in separate but simultaneous trials. During deliberations, a sheriff taking forensic evidence to the Stevens jury noticed that the Brown jury had an inadmissible police report. Brown maintains that the jury's exposure to that report had a substantial and injurious effect on the verdict. However, because the police report was cumulative of evidence before the jury, the jury was properly instructed, and exposure to the report was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), we affirm.

## I. BACKGROUND

Brenda Green testified that she was sitting in the driver's seat of her parked car with her boyfriend, Leon Mayes, in the front passenger seat, when a silver Pontiac Sunbird backed up so it was right next to her car. Green recognized the driver as "Striker," who had dated her sister, and the passenger as "Poo," who had dated her friend. She had known each man for about five years. In addition, Green noticed that two others sat in the backseat of the Pontiac and knew the silver Pontiac belonged to "Striker's" girlfriend, Valencia. She recognized "Banks" as one of the people sitting in the backseat because he had gone to grammar school with Green's sister.

Green heard someone in the Pontiac yell, "There go that m----- f-----." The car then drove off at Mayes's request. The Pontiac pursued Green's car in a high speed chase

for several blocks remaining "right behind" her. When Green turned left from 51st Street onto Ashland Avenue, she heard gunshots. Mayes said that "Striker" was shooting at her car. Looking in the rearview mirror, Green saw "Striker's" left hand coming out of the car with a gun. Mayes told Green to slow the car down and to jump out, and she did. Mayes remained in the car as it rolled down the street. The Pontiac then pulled over to the side of the street, "Poo" got out, ran up to Green's car, and shot into the passenger side of the car where Mayes was sitting. With his last shot, "Poo" said: "We got that m----- f-----. Bar None, running it." "Poo" got back into the Pontiac and "Striker" drove away.

Green approached her car, which had stopped against a pole at 50th Street and Ashland Avenue. She found Mayes "shot up in a lot of blood." At the scene, Green told police that "Striker" and "Poo" were responsible for the shooting.

Viewing photographs at the police station that same night, Green identified Andre Brown, Derrick Stevens, and Marlin Gosa, as "Striker," "Poo" and "Banks" respectively. She also identified all of them in lineups. Green further identified Brown in open court as one of the shooters, reiterating that he was "Striker" and that he had shot Mayes.

In addition, Marlin Gosa testified that he, Brown and Stevens were members of the Black P Stones gang, and identified Brown as "Striker." Prior to the trial, Gosa provided a signed statement and grand jury testimony detailing his eyewitness account of Mayes's murder. The

statement and grand jury testimony indicated that Gosa was standing on a street corner, when "Dre" (a/k/a Andre Brown) appeared driving a gray Pontiac. Stevens sat in the Pontiac's front passenger seat. Brown and Stevens tried to convince Gosa to accompany them to a night-club for Brown's birthday. Gosa declined but asked Brown to drive him home.

After driving a few blocks, Brown spotted a familiar man and woman sitting in an old Chevrolet. Brown passed the Chevrolet, then reversed to pull even with it and shouted, "She with that m----- f-----." The woman behind the wheel said something and drove away sud-denly. She then led Brown on a high speed chase. During the chase, Gosa saw Brown sticking a gun through his window and fire it at the man in the Chevrolet's front passenger seat. The chase ended when the woman jumped out. Brown stopped the Pontiac and Stevens exited holding Brown's gun. Stevens ran towards the Chevrolet, firing repeatedly into its passenger side. Fleeing from the shooting, Brown remarked, "The b---- better not tell," referring to the woman who witnessed the crime. Brown, a Black P Stone general, instructed Gosa not to talk to police about the murder.

Notwithstanding his statement and grand jury testi-mony, Gosa failed to respond to the subpoena to appear at Brown's trial. After being arrested and forced to appear, Gosa claimed—despite his earlier testimony and the recovery of his fingerprints on Valencia Wash-ington's Pontiac—he was not with Brown on the night of the murder. Gosa conceded that he gave a handwrit-

ten statement and testified before the grand jury that he was in a car with Brown and Stevens on October 10, that the car was involved in a high speed chase, and that Brown and Stevens had shot Mayes. Nevertheless, Gosa maintained that the police told him what to say in his statement and that he lied to the grand jury because the police threatened to charge him with murder. As to the sequence of events surrounding the car chase and the shootings, Gosa's signed statement and grand jury testimony were not dissimilar from Green's testimony.

The jury heard that at the time of the murder, Brown lived with Valencia Washington, the mother of his child and owner of the silver Pontiac involved in the murder. Brown had a set of keys to Washington's car and it was not unusual for him to drive it. When Brown returned the morning after the shooting and heard that police had visited looking for him, he fled. Washington did not see Brown again for over ten months.

Soon after Mayes was shot, Chicago Police Officer James Sullivan interviewed several witnesses to the murder, including Green. Sullivan summarized the information he gathered from the interviews in a case report. The one-page, two-sided report listed six witnesses to the crime, named "Pooh" and "Striker" as the offenders, noted the offenders were members of the "Stones," provided a description and license plate number of the offenders' vehicle, and included a brief description of the crime. Of the six witnesses listed in the document, one was the murder victim, Mayes, one was Green, and one was Kenneth Thornton. Mayes was

witness 1, Green was witness 2, and Thornton witness 3. The police report labeled the other three witnesses 4 through 6. The report attributed to witnesses 3-6 the following description:

> [T]hey all witnessed off[ender]s run up to the victim while firing several shots. Off[ender]s then got into their vehicle and fled in an unknown direction. The veh[icle] the victim was in then began to proceed north bound on Ashland at [illegible word] [illegible word] striking a pole at 5000 S. Ashland.

At trial, defense counsel used the police report to cross-examine Green and Sullivan. The questioning established: (1) that the police report listed six witnesses to the crime, including Thornton; (2) at the crime scene, Green identified Brown and Stevens as Mayes's killers—Stevens by his street name and Brown by his street name or by his street name and his legal name; and (3) Brown drove Valencia Washington's car during the attack, while Green provided its license plate number to Sullivan at the crime scene.

Prior to deliberations, the court instructed the jury as follows: "The evidence which you should consider consists only of the testimony of the witnesses, the exhibits, and stipulations which the court has received." The court further instructed that for first-degree murder the state must prove that during the commission of the offense Brown personally discharged a firearm.

During its deliberations, the jury sent out a note asking if it needed to prove that Brown personally discharged a firearm. The jury also asked for the police report docu-

menting other witnesses' names, Valencia Washington's license plate number, whether any statements were taken from the other witnesses at the crime scene and whether they could see their statements. The court responded—with the approval of Brown's attorney—as follows: "No, you may not have additional evidence. You have received all of the evidence. I direct your attention to the first instruction that indicates the evidence which you should consider consists only of the testimony of the witnesses, the exhibits, and stipulations which the Court has received."

Meanwhile, the Stevens jury had finished hearing closing arguments and jury instructions. The sheriff went into Brown's jury room to retrieve the only copy of the forensic evidence to give to Stevens' jury. At that time, the sheriff saw one of the Brown jurors reading a police report that had not been admitted into evidence and took it to the judge. The parties agreed that the police report had been inadvertently left in an envelope that contained admitted exhibits.

The jury sent out another note asking about the process if it could not reach a unanimous verdict. The jury was told to continue deliberating. Later, the jury wrote an additional note asking, "Can we please have back the yellow folder that was half way slit on the side and included the police report of the inventory of items taken?" However, the police report at issue contained no inventory of items. With the consent of Brown's attorney, the court proposed to repeat the response to the first note. But, before the court could respond, the jury announced it had reached a verdict.

After the reading of the verdict, defense counsel moved for a mistrial on the ground that the jury's request for the police report indicated that it had considered it during its deliberations. The prosecutor responded that the jury's request indicated that it could not remember the contents of the police report and did not rely on the police report in reaching the verdict.

The court denied the mistrial motion on the ground that exposure of the jury to the report did not prejudice Brown; the disclosure was inadvertent; much of the information in the report was brought out by the defense to impeach the state's witnesses; and the jury was instructed that it should only consider the testimony of the witnesses, the exhibits, and stipulations that the court received.

On direct appeal, Brown argued, in part, that the jury's exposure to the police report violated his Fourteenth and Sixth Amendment rights to due process and to confront witnesses against him. The Illinois Appellate Court, First Judicial District, affirmed on July 23, 2007, citing Brown's identification through Green's testimony and Gosa's signed statement and grand jury testimony. Brown's petition for leave to appeal to the Illinois Supreme Court was denied on November 29, 2007.

Brown filed a timely petition for writ of habeas corpus in the Northern District of Illinois, which was denied on November 5, 2009. The district court held that under *Brecht* the error in the state court did not have a substantial injurious effect or influence on the jury. Specifically, the district court cited the cumulative nature of

the information in the police report and the trial court's curative instructions in response to the jury's request for the report. Brown's request for a certificate of appealability was denied by the district court, but, this court granted it on the following issue: "whether [petitioner] was prejudiced by the presence of an inadmissible police report in the jury room."

## II.  DISCUSSION

The Illinois Appellate Court found that an error occurred in Brown's trial, but affirmed his conviction after applying the wrong standard. Citing *Cranwill v. Donahue*, 132 Ill. App. 3d 873, 478 N.E.2d 22 (3d Dist. 1985), the court acknowledged that juries should not see police reports because they are in the nature of hearsay but determined that Brown was not prejudiced because there was no "aura of mystery" surrounding the report. However, the appellate court should have determined whether the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

Recognizing that *Cranwill* was the wrong standard, the district court applied *Brecht v. Abrahamson*, and considered whether the entry of the inadmissible police report into the jury room had a substantial and injurious effect or influence on the jury's decision. 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The district court concluded:

> The trial court made clear to the jury, in response to [its] question about the police report, that the only

evidence to be considered was the testimony of the witnesses, the exhibits and any stipulations received by the court. The substantial weight of the properly admitted evidence, along with the court's clear instruction to the jury that the police report was not a part of the evidence, effectively further limited the impact of the trial error. It cannot be said that the entry of the police report into the jury room had a substantial or injurious effect.

The initial question on federal review of a habeas petition is whether the state court decision involved an unreasonable application of clearly established federal law. 42 U.S.C. § 2254(d). However, if the state court never conducted the harmless error analysis or otherwise applied *Chapman* unreasonably, the federal court must make an independent decision as if the state court never addressed the subject at all. *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009). Hence, here, the *Brecht* standard is appropriate in determining whether the error was harmless. *Id.*

Where a federal judge in a habeas proceeding is "in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995). However, in the habeas context, "trial errors are often found harmless where the record is replete with overwhelming evidence of the defendant's guilt." *Whitman v. Bartow*, 434 F.3d 968, 971 (7th Cir. 2006). In addition, erroneously admitted evidence, if

cumulative, is also harmless error. *See Hinton v. Uchtman*, 395 F.3d 810, 821 (7th Cir. 2005) (citing *Brecht*, 507 U.S. at 639, 113 S. Ct. 1710).

According to Brown, habeas corpus must be granted because even under *Brecht* the error was substantial. He cites the unreliable nature of eyewitness identification and the jury's request to see the erroneously admitted report after being instructed on what is evidence. Specifically, Brown argues that Green and Gosa were not credible, purposefully lied to police and failed to recall matters during their trial testimony. Green, for example, testified that she lived with her parents and had never given another address. On cross-examination, Green admitted lying to police about her name and where she was living at age 16 (in 1991) hoping to stay out of trouble. Also, Green did not give police the name of Andre Brown immediately, but rather identified "Striker" and "Poo" as individuals she knew. On cross-examination, she could not recall whether she ducked down during the chase and shooting or whether she left the car in drive.

Brown ignores that Green identified him at the scene, within hours of the murder while viewing photographs at the police station, and in a lineup. In addition, Brown fails to acknowledge that Green identified him in open court as one of the shooters. Whether she ducked down as shots were fired or remembered to put the car in park were matters of credibility for the jury to assess. *See United States v. Williams*, 216 F.3d 611, 614 (7th Cir. 2000). At best, these facts are peripheral to

Green's unequivocal identification of Brown and cer-
tainly not facts that would render her testimony excep-
tional or physically impossible. *Id.*

Admittedly, Marlin Gosa never accused Brown at
trial and maintained that his prior statements to police
were untrue. However, Gosa acknowledged his prior,
handwritten statement and testimony before the
grand jury regarding Mayes's killing. His prior state-
ment and testimony were read and received as evidence
corroborating Green's trial testimony. And while the
jury seemed deadlocked prior to reaching a verdict and
twice asked to see the police report, its note to the
court referred to a "yellow folder that was half way slit
on the side and included the police report of the in-
ventory of the items taken." The police report at issue
did not contain an inventory of the items.

Ultimately, Brown has not refuted the appellee's asser-
tions that the one-page, two-sided, police report con-
tained no material evidence that was not otherwise
before the jury. The police report indicated that there
were six witnesses to the shooting of Mayes, including
Kenneth Thornton, and the trial testimony established that
the police report listed six witnesses including Green and
Thornton. The police report identified the offenders as
"Pooh" and "Striker," members of the Stones gang, and the
trial testimony established the same. The police report pro-
vided a description and license plate number, and the
trial testimony established that the assailants drove
a gray Pontiac displaying a license plate matching
Valencia Washington's license plate. Moreover, the police

report stated that the non-testifying witnesses saw the assailants run to the victim while firing shots, get into their vehicle, then flee as the car with the victim rolled north on Ashland and struck a pole. Additionally, the trial testimony established that Stevens ran toward the victims' vehicle firing multiple shots into the passenger side, the assailants drove away, and Green's car continued to roll until it hit a pole at 50th and Ashland. It is especially notable that Brown's counsel used the police report in an attempt to impeach state witnesses. Indeed, Brown was convicted after the curative instruction made clear to the jury that the requested police report was not in evidence.

This is not a case of grave doubt. The evidence against Brown cited by the appellee and unrefuted by Brown was overwhelming, and the police report that went to the jury room mistakenly was cumulative. Brown had the opportunity to cross-examine Green and Gosa, both of whom had the opportunity to observe him at the time of the shooting and implicated him as the driver who fired shots at Mayes. Arguing that others have been cleared with DNA evidence or that courts recognize the inherent dangers of eyewitness identification does not undermine the strength of the evidence in this record. The jury was in the best position to assess the credibility of Green and Gosa and, under these circumstances, this court cannot find that it is "reasonably likely" that the jury relied on the inadmissable police report and that the police report "had substantial and injurious effect or influence" in determining the verdict.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Brown's petition for a writ of habeas corpus.