WILLIAMS, Circuit Judge.
Julie Jensen’s handwritten letter to the police was “a make or break issue,” an “essential component of the State’s case,” and of “extraordinary value” to “the central issue in this case.” Those are not the court’s words, but the words of the State, as it fought for the admission of the letter before it placed Mark Jensen on trial for his wife Julie’s murder. The State maintained at trial that Jensen killed his wife and framed it to look like suicide. Jensen’s defense was that his wife, depressed, *895 and unhappy in marriage, committed suicide and made it look like her husband had killed her. A key piece of evidence at trial was Julie’s handwritten letter to the police, written two weeks before her death, in .which she wrote that she would never take her life and that her husband should be the suspect if anything should happen to her.
As a later-decided United States Supreme Court case, Giles v. California, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), made clear, this letter and other accusatory statements she made to police in the weeks before her death regarding ' her husband should never have been introduced at trial. The Wisconsin appellate court found the error in admission to be harmless. Jensen now seeks a writ of habeas corpus, which he may only receive if the Wisconsin appellate court’s adjudication of the claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” or “resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). We agree with the district court that the Wisconsin appellate court’s harmless error determination reflects an unreasonable application of the Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), harmless error standard. The erroneous admission of Julie’s letter and statements to the police had a substantial and injurious influence or effect in determining the jury’s verdict. So we affirm the district court’s grant of Jensen’s petition for a writ of habeas corpus.
I. BACKGROUND
Two weeks before her death, Julie Jensen gave a sealed envelope to her neighbors, Tadeusz and Margaret Wojt, and told them that if anything happened to her, they should give the envelope to the police. The day of Julie’s death, the Wojts did just that. The envelope contained a handwritten letter with Julie’s signature that read:
Pleasant Prairie Police Department, Ron Kosman or Detective Ratzburg,
I took this picture [and] am writing this on Saturday 1121-98 at 7 AM. This “list” was in my husband’s business daily planner — not meant for me to see, I don’t know what it means, but if anything happens to me, he would be my first suspect. Our relationship has deteriorated to the polite superficial. I know he’s never forgiven me for the brief affair I had with that creep seven years ago. Mark lives for work [and] the kids; he’s an avid surfer of the Internet Anyway, I do not smoke or drink. My mother was an alcoholic, so I limit my drinking to one or two a week. Mark wants me to drink more — with him in the evenings. I don’t. I would never take my life because of my kids^ — they are everything to me! I regularly take Tylenol [and] multi-vitamins; occasionally take OTC stuff for colds, Zantac, or Immodium; have one prescription for migraine tablets, which Mark use[s] more than I.
I pray I’m wrong [and] nothing happens ... but I am suspicious of Mark’s behaviors [and] fear for my early demise. However, I will not leave David [and] Douglas. My life’s greatest love, accomplishment and wish: “My 3 D’s” — Daddy (Mark), David, Douglas.
Julie had made other similarly accusatory statements to the police in the weeks before her death as well. She left two voicemails for Officer Ron Kosman, stating in the second that she thought her husband was trying to kill her. (She left this message on a voicemail despite Officer Kosman’s message on his voicemail that he *896 was out of the office on a hunting trip and would not check messages until his return.) Officer Kosman then visited Julie, and she told him she had given a letter to the Wojts along with a roll of film with photographs she had taken of Jensen’s day planner, evidently to include the “list” in his planner referenced in her letter. She retrieved the film and gave it to Officer Kosman, but the police were unable to connect the photographs of the pages of Jensen’s day planner to anything connected to the case. Julie also told Officer Kosman that if she were to be found dead, she did not commit suicide, and Jensen was her first suspect. She made statements to others as well including the Wojts and her son’s teacher that she worried her husband was going to kill her.
Julie was found dead in the home she shared with her husband and their two sons on December 3, 1998. The first autopsy did not reveal a cause of death,' and the case was initially treated as a suicide. A search of the Jensens’ home computer yielded internet searches for suicide and poisoning, including a search at 7:40 am on December 3 for “ethylene glycol poisoning.” Ethylene glycol, commonly known as antifreeze, was found in Julie’s system. But the toxicologist (Dr. Christopher Long)’s initial characterization was badly off. He described the 3,940 micrograms per milliliter of ethylene glycol in the 660 ml of her gastric contents as a “large concentration of ethylene glycol.” His report reached the conclusion that Julie’s death was not a suicide, and he reached this conclusion by relying on factors including that Julie’s stomach contained significant amounts of ethylene glycol, showing that her death occurred at or near the time of administration; she would have been too weak to drink the amount of ethylene glycol in her stomach without assistance; and she would have been too weak to hide the ethylene glycol container after her final dose. But in reality, the 660 ml of her stomach contents contained only a half teaspoon of ethylene glycol, or .083 ounces, so it was not a “large concentration.” Dr. Long’s mistake destroyed the foundation of his opinion that Julie’s death was not a suicide, i.e., that she could not have consumed that large a quantity of ethylene glycol on her own. The computer search also revealed numerous emails between Jensen and a woman with whom he was having an affair.
In March 2002, over three years after Julie’s death, Jensen was charged with first-degree intentional homicide. Dr. Mark Chambliss, the doctor who conducted an autopsy, said at trial for the first time that the cause of death was asphyxia by smothering, and a medical examiner concluded that the cause of death was ethylene glycol poisoning with probable terminal asphyxia. From the beginning, the parties contested the admissibility of Julie’s letter and her statements to Officer Kosman in the weeks before her death. The State conceded that the voicemails Julie left for Officer Kosman were inadmissible hearsay. The Wisconsin state trial court ruled that Julie’s letter was admissible in its entirety. After the Supreme Court decided Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), Jensen moved for reconsideration. The trial court granted Jensen’s motion for reconsideration, ruling that Julie’s letter and statements to Officer Kosman were testimonial and therefore not admissible under Crawford because the declarant was unable to testify at trial and there was no prior opportunity for cross examination. The court also rejected the State’s argument that the letter and Julie’s statements were admissible under the doctrine of forfeiture by wrongdoing.
The State appealed the trial court’s order and petitioned for bypass directly to the Wisconsin Supreme Court. On Febru *897 ary 23, 2007, the Wisconsin Supreme Court agreed that the letter and statements to police were testimonial, but it also ruled that the trial court erred in its analysis of whether the statements were admissible under the forfeiture by wrongdoing doctrine. State v. Jensen, 299 Wis.2d 267, 727 N.W.2d 518, 536-37 (2007) (“Jensen I”). The Wisconsin Supreme Court adopted “a broad forfeiture by wrongdoing doctrine, and conclude[d] that if the State can prove by a preponderance of the evidence that the accused caused the absence of the witness, the forfeiture by wrongdoing doctrine will apply to the confrontation rights of the defendant.” Id. at 536. The court remanded for a hearing to determine the application of the doctrine in Jensen’s case. Id. at 537.
On remand, after a ten-day hearing, the trial court found by a preponderance of the evidence that Jensen killed Julie, causing her absence from trial, and so Jensen had forfeited his right to confrontation with respect to the letter.[1] As a result, the letter and Julie’s statements to Officer Kosman were admissible at trial.
The resulting six-week trial began more than nine years after Julie’s death. The State introduced evidence concerning Julie’s statements and actions in the days, weeks, and months before her death, including her handwritten letter and statements to Officer Kosman. The State also introduced evidence that Jensen was having an affair and that he was bitter about a brief affair Julie had seven years earlier. Two of Jensen’s former co-workers testified that he had made incriminating statements to them. The State contended that Jensen had made plans to murder his wife to have a future with his mistress, wanted to avoid a messy divorce, and had searched on the internet for ways to make Julie’s death look like a suicide. The State also argued that Julie was a devoted mother who would not have committed suicide. The State maintained that Julie could not have ingested ethylene glycol by herself and that Jensen had suffocated her after she showed signs of recovering from poison he had given her.
Surprisingly, this suffocation theory arose for the very first time at the trial more than nine years after Julie’s death, when it came up for the first time during Dr. Chambliss’s redirect examination. Dr. Chambliss had performed an autopsy, and his report had not identified a cause of death. But during redirect examination, the prosecutor showed Dr. Chambliss photographs of Julie at the scene that appeared to show Julie with an unnaturally bent nose. The prosecutor posed a hypothetical question to Dr. Chambliss. It asked him to, among other things, “consider the manner in which the face appears to be smashed into the pillow” and to consider information from Jensen’s cellblock mate Aaron Dillard (whose significant credibility concerns .we will discuss later) that Jensen “had shoved her face into the pillow and suffocated her.” When the prosecutor asked whether Dr. Chambliss had an opinion as to the cause of death in those circumstances, Dr. Chambliss responded with the opinion, for the first time, that the immediate cause of death would be smothering. Yet the autopsy report did not report any damage to Julie’s nose, and witnesses at the scene had not observed anything unusual about her nose. *898 As for Dr. Mainland, she had testified at the forfeiture hearing that Julie died from ethylene-glycol poisoning. Then five months later, at trial, she too testified that Julie had been suffocated, based on details from Dillard.
The defense account at trial was much different. It took the position that Julie, depressed, had committed suicide by poisoning herself but had made it look as though her husband, from whom she was distant, had killed her. The defense maintained that Julie was discouraging others from worrying about her absence so they would not come to her assistance. Julie had not been restrained or otherwise incapacitated from seeking help, and ethylene glycol was a fairly slow-acting poison, so the defense contended that Julie’s failure to seek help was more consistent with suicide than with murder.
The defense evidence included testimony from the Jensens’ family doctor, who told the jury that during an appointment two days before her death, Julie “seemed depressed and distraught and almost frantic, actually.” The jury heard Julie had a fifteen-minute conversation with her neighbor, Mrs. Wojt, the day before her death in which she told Mrs. Wojt not to worry if she did not see Julie outside that day because she was not feeling well due to her medication. Julie also made a similar statement to her sister-in-law three days earlier that she would be ill on December 2 because she expected to be put on medication by her doctor. The defense also highlighted that although Julie had made multiple statements saying she feared her husband was trying to kill her, she did not call anyone or otherwise seek help when she began to feel ill.
After thirty hours of deliberation, the jury convicted Jensen of first-degree intentional homicide. Four months later, the United States Supreme Court decided Giles v. California, 554 U.S. 358, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), which adopted a narrower interpretation of the Confrontation Clause than had the Wisconsin Supreme Court in Jensen I. On the direct appeal of his conviction, Jensen argued that Giles made clear that Julie’s handwritten letter and statements to the police were erroneously admitted.
In a December 29, 2010 ruling, the Wisconsin Appellate Court “assume[d] that the disputed testimonial evidence was erroneously admitted” in light of Giles but found that any error was harmless, and it affirmed Jensen’s conviction. State v. Jensen, 331 Wis.2d 440, 794 N.W.2d 482, 493 (App.Ct.2010) (“Jensen II ”). The Wisconsin Supreme Court denied Jensen’s petition for review. Jensen then filed a petition for a writ of habeas corpus in federal district court. The district court granted Jensen’s petition, and the warden appeals.
II. ANALYSIS
Jensen’s habeas petition is premised on his contention that the admission of Julie’s handwritten letter and her accusatory statements to the police in the weeks before her death violated his right to confrontation under the Sixth Amendment to the United States Constitution. The Sixth Amendment provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” Ordinarily, a witness who makes testimonial statements against a defendant will be available at trial for cross examination, and if not available then the witness’s earlier testimony will only be introduced at trial if the defendant had an earlier opportunity to cross examine the witness. See Crawford, 541 U.S. at 68; 124 S.Ct. 1354.
The state trial court concluded that an exception to the right of confrontation was present here because Jensen had committed a wrongful act (murder) that made *899 the witness unavailable to testify at trial. But the Supreme Court subsequently held in Giles that the forfeiture by wrongdoing exception to the Confrontation Clause in the United States Constitution applies only when the defendant engaged in conduct designed to prevent the witness from testifying. Giles, 554 U.S. at 359, 128 S.Ct. 2678; see also id. at 367, 128 S.Ct. 2678 (“Every commentator we are aware of has concluded the requirement of intent ‘means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable.’ ”) (citation omitted). In other words, testimonial hearsay statements for which no other exception applies should be excluded if “the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying — as in the typical murder cases involving accusatorial statements by the victim.” Id. at 361, 128 S.Ct. 2678. The warden makes no argument that the letter and statements were admissible under Giles. Indeed, the State’s theory at trial was that Jensen killed his wife not to prevent her from testifying, but because he wanted her dead. Under Giles, the admission of Julie’s letter and statements to the police, none of which were dying declarations, violated the Confrontation Clause and was federal Constitutional error. The warden does, however, argue that Jensen cannot benefit from Giles as a procedural matter, and we turn to that argument now.
A. Giles Decided Before Claim Adjudicated on the Merits by State Court
The parties dispute which Wisconsin state court decision constitutes the relevant decision for Antiterrorism and Effective Death Penalty Act of 1986 (“AEDPA”) purposes. Under AEDPA, habeas relief
shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d)(1) (emphasis added). Jensen argues that the Wisconsin appellate court’s post -Giles decision is the. last state-court decision adjudicating his claim on the merits, and he maintains our review under AEDPA is therefore of the state appellate court decision.
The warden, however, argues that the last state court adjudication of the merits of Jensen’s Confrontation Clause claim was the trial court’s 2007 decision concluding that the disputed evidence was admissible under the forfeiture by wrongdoing exception. Because the Supreme Court did not decide Giles until 2008, the warden contends there is no decision contrary to clearly established Supreme Court case law at the time, and so Jensen’s petition for habeas relief fails. The state appellate court assumed that the disputed testimonial evidence was erroneously admitted under Giles but found that any error was harmless, and the warden maintains the state appellate court did not adjudicate the claim “on the merits” because the decision was made on harmless-error grounds. Jensen II, 794 N.W.2d at 493.
If the warden is correct that the trial court decision is the relevant decision in this case, Jensen’s habeas request fails because it is premised on Giles, which the *900 Supreme Court had not decided at the time of the trial court ruling. See Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011) (measuring state-court decisions against the Supreme Court precedents as of the time the state court renders its decision); Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) (stating it is not an unreasonable application of clearly established federal law “for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.”).
The United States Supreme Court’s recent decision in Davis v. Ayala, — U.S. -, 135 S.Ct. 2187, 192 L.Ed.2d 323 (2015), guides us here. There, neither the criminal defendant nor his lawyer was given the opportunity to be present during the hearings on his challenges to the prosecutor’s use of peremptory challenges to exclude minority jurors, and he maintained that the ex parte hearings violated his federal Constitutional rights. Id. at 2194-95. The California Supreme Court ruled that any error was harmless beyond a reasonable doubt. Id. at 2195 (citing People v. Ayala, 24 Cal.4th 243, 99 Cal. Rptr.2d 532, 6 P.3d 193, 204 (2000)). The United States Supreme Court granted a petition for a writ of certiorari, and one of the questions was “[w]hether a state court’s rejection of a claim of federal constitutional error on the ground that any error, if one occurred, was harmless beyond a reasonable doubt is an ‘adjudication] on the merits’ within the meaning of 28 U.S.C. § 2254(d), so that a federal court may set aside the resulting final state conviction only if the defendant can satisfy the restrictive standards imposed by that provision.” Brief for Petitioner at i, Chappell v. Ayala, 135 S.Ct. 401 (2014) (No. 13-1428), 2014 WL 2335007, at *i; see Chappell v. Ayala, — U.S.-, 135 S.Ct. 401, 190 L.Ed.2d 288 (Oct. 20, 2014) (granting petition for writ of certiorari).
In its resulting decision, the Court stated that “[t]here is no dispute that the California Supreme Court held that any federal error was harmless beyond a reasonable doubt under Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)].” Ayala, 135 S.Ct. at 2198. The Court then ruled that “this decision undoubtedly constitutes an adjudication of Ayala’s constitutional claim ‘on the merits.’ ” Id.
That a state court holding of harmless error beyond a reasonable doubt constitutes the adjudication of a claim on the merits for AEDPA purposes makes sense. The Court has previously explained that “as used in this context, the word ‘merits’ is defined as l[t]he intrinsic rights and wrongs of a case as determined by matters of substance, in distinction from matters of form.’ ” Johnson v. Williams, — U.S. -, 133 S.Ct. 1088, 1097, 185 L.Ed.2d 105 (2013) (quoting Webster’s New International Dictionary 540 (2d ed.1954)). In contrast, an adjudication on matters “extraneous” to the particular elaim, “such as competence of the tribunal or the like,” or on “procedural details” or “technicalities,” would not be a decision “on the merits.” Id. A harmless-error determination is a substantive determination, not merely one of form.
In his brief written before Ayala, the warden pointed to Greene v. Fisher, — U.S. -, 132 S.Ct. 38, 43, 181 L.Ed.2d 336 (2011). In Greene, the parties agreed that the last state court adjudication on the merits of a federal Confrontation Clause claim took place on direct appeal to the Pennsylvania Superior Court. Id. at 45. The United States Supreme Court decision on which the defendant wished to rely, Gray v. Maryland, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), did not issue until three months later. The Greene Court ruled that although Gray *901 was issued while the defendant’s petition for leave to appeal to the Pennsylvania Supreme Court was pending, and that court initially granted the petition (though later dismissed it as improvidently granted), Gray was not “clearly established Federal law” under AEDPA because it had not been issued at the time of the last state-court adjudication on the merits. Id. No harmless-error determination was at issue in Greene, and Greene does not inform the analysis of whether a harmless-error determination is an adjudication on the merits.
Under Ayala, though, it is clear that the Wisconsin appellate court decision is the last “adjudication on the merits” for AED-PA purposes in Jensen’s case. Therefore, Giles had been decided by the time of the last adjudication of the claim on the merits, and Julie’s letter and the statements to Officer Kosman at issue were admitted in violation of Jensen’s rights under the United States Constitution, as shown by clearly established Supreme Court precedent at the time of the Wisconsin appellate court decision.
B. Error Had Substantial and Injurious Effect in Determining Jury’s Verdict
We must now assess whether the Wisconsin appellate court’s decision that any federal constitutional error was harmless was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). Jensen maintains it was, and the district court agreed.
“The test for whether a federal constitutional error was harmless depends on the procedural posture of the case.” Ayala, 135 S.Ct. at 2197. When a case is on direct appeal, the standard for harmless error is that articulated in Chapman: “ ‘[Bjefore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.’ ” Ayala, 135 S.Ct. at 2197 (quoting Chapman, 386 U.S. at 24, 87 S.Ct. 824).
However, because the conviction here originated in state court, this case is a collateral proceeding governed by AED-PA. Our case law had given some contrary signals as to the applicability of the Supreme Court’s decisions in Chapman and Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), in cases where the state-court ruling was based on harmless error. Compare, e.g., Kamlager v. Pollard, 715 F.3d 1010, 1016 (7th Cir.2013) and Brown v. Rednour, 637 F.3d 761, 766 (7th Cir.2011) with, e.g., Jones v. Basinger, 635 F.3d 1030, 1052 n. 8 (7th Cir.2011) (recognizing that “any error sufficiently harmful to satisfy the Brecht ‘actual prejudice’ standard could be deemed harmless only by unreasonably applying Chapman.”).
The Supreme Court’s recent decision in Ayala clarified the standard of review. For habeas petitioners like Jensen, where the state court ruled that an error in admission was a harmless error, the petitioners are
“not entitled to habeas relief based on trial error unless they can establish that it resulted in ‘actual prejudice.’ ” Brecht, 507 U.S. at 637, 113 S.Ct. 1710 (quoting United States v. Lane, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). Under this test, relief is proper only if the federal court has “grave doubt about whether a trial error of federal law had ‘substantial and injurious effect or influence in determining the jury’s verdict.’ ” O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).
Ayala, 135 S.Ct. at 2197-98.
So the Supreme Court has made clear that Jensen must meet the Brecht stan *902 dard. But Ayala also makes clear that this requirement does not mean that the Wisconsin appellate court’s harmless error determination lacks significance. See Ayala, 135 S.Ct. at 2198. Rather, the “Brecht standard ‘subsumes’ the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court’s determination that a • constitutional error was harmless under Chapman.” Id. (citing Fry v. Pliler, 551 U.S. 112, 120, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007)). While a federal court adjudicating a habeas petition does not need to “ ‘formally]’ apply both Brecht and ‘AEDPA/ Chapman,’ AEDPA nevertheless ‘sets forth a precondition to the grant of habeas relief.’ ” Ayala, 135 S.Ct. at 2198.
Jensen maintains that the Brecht standard is satisfied here and that the Wisconsin court’s finding that the error was harmless beyond a reasonable doubt was not just wrong, but also unreasonable. Cf. Ayala, 135 S.Ct. at 2199 (stating that when reviewing state court’s determination that error was harmless under Chapman, federal court cannot grant habeas relief unless harmlessness determination itself was unreasonable). He also argues that the Wisconsin court unreasonably applied clearly established Supreme Court law by applying the wrong test, failing to consider his evidence in defense, and erroneously determining that key points of evidence were undisputed.
We begin with the test for harmless error. Time and again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict. Nearly seventy years ago, in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Supreme Court explained as it conducted harmless-error review of jury’s decision:
And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had on the jury’s decision____The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.
Id. at 764-65, 66 S.Ct. 1239. The Supreme Court has reinforced this principle over and over. For example, in Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), the Court considered a death sentence where the state appellate court found contested testimony harmless on the basis that the properly admitted evidence would have been sufficient to support a jury decision. Id. at 258, 108 S.Ct. 1792. The Supreme Court reversed, explaining, “[t]he question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather whether the State has proved ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.’ ” Id. at 258-59, 108 S.Ct. 1792 (quoting Chapman, 386 U.S. at 24, 87 S.Ct. 824). Finding this standard satisfied, the Court reversed the state court’s judgment. Id. at 260, 108 S.Ct. 1792; see also Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (“The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.”); Fahy v. State of Conn., 375 U.S. 85, 86, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (“We find that the erroneous admission of this unconstitutionally obtained evidence at this petitioner’s trial was prejudicial; therefore, the error *903 was not harmless, and the conviction must be reversed. We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of.”).
Despite this long line of cases establishing the test for harmless error, the Wisconsin appellate court’s reasoning reads as though it is conducting an evaluation of whether there was sufficient evidence to support the verdict, not whether the error in admitting Julie’s letter and statements to police affected the jury’s verdict. Cf. Kotteakos, 328 U.S. at 764-65, 66 S.Ct. 1239. Near the beginning of its analysis, the state appellate court stated, “Here, we will not attempt to catalog all the untainted evidence the State presented; however, we will summarize some of the compelling pieces in order to illustrate that the record is replete with reason to uphold the jury’s verdict, even if the assumedly tainted evidence is disregarded.” Jensen II, 794 N.W.2d at 493. The court then went through five categories of evidence presented by the State — computer evidence, motive evidence, Jensen’s incriminating statements, medical evidence, and miscellaneous evidence. Id. at 493-94. The court said this was evidence from which “a rational jury could alone conclude beyond a reasonable doubt” that Jensen murdered his wife. Id. at 494. But a statement of what a “rational jury could conclude” is not a statement of a harmless-error inquiry; it is instead the question presented when a direct appeal asks whether there is sufficient evidence to support a verdict. See State v. Kimbrough, 246 Wis.2d 648, 630 N.W.2d 752, 756 (App. 2001). That is not the question here.
The state appellate court next said it woxild examine the admitted testimonial evidence to determine whether any error in admitting it was harmless. Id. at 495, 630 N.W.2d 752. It looked at Julie’s letter and found other properly admitted evidence in the record that the appellate court said made similar points as to those made in the letter, or to corroborate statements in the letter. For example, the court stated that a sentence in Julie’s letter stating that “if anything happens to me, he would be my first suspect” was assumed inadmissible evidence. It then discussed what it termed “[ad]missible duplicative/corroborative evidence in the record.” Id. at 495, 630 N.W.2d 752. The court pointed to Mr. Wojt’s testimony that about a month before her death, Julie told him she suspected Jensen was trying to poison her or drive her nuts to take the children from her. Id. at 496, 630 N.W.2d 752. Mr. Wojt also recounted that Julie said Jensen would go to work and leave his computer on with a screen displaying a website about poisoning. Id. The court also pointed to her son’s teacher’s testimony recounting Julie’s statement, “I think my husband is going to kill me” as well as Jensen’s sister’s testimony that Julie told her in the fall of 1998 that she thought Jensen might be planning to kill her. Id.
The court concluded its discussion comparing the individual statements in the letter to other evidence in the record by stating, “The State’s additional evidence, compared to Julie’s letter, illustrates that virtually all relevant information in Julie’s letter was duplicated by admissible nontestimonial evidence from other sources. The rest of the record reflects that the jury heard overwhelming evidence of murder, and upon this record, it could rationally have concluded beyond a reasonable doubt that Jensen murdered Julie. The same is true regarding Julie’s testimonial statements to Kosman; that is, virtually everything related in Julie’s statements to Kosman was duplicated by admissible evidence from other sources.” Jensen II, 794 N.W.2d at 498. This analysis from the Wisconsin appellate court demonstrates *904 that it is conducting a review for whether there is sufficient evidence to support a verdict, a review that looks at all the evidence in the light most favorable to the conviction, and where the inquiry is only whether the jury could have convicted. See Kimbrough, 630 N.W.2d at 756. That is very different than the harmless error test under clearly established Supreme Court law.
And these statements do not just seem to be slips of the pen. The state appellate court decision contains a very detailed discussion of the State’s evidence. But its discussion does not engage with the defense evidence that goes against the evidence discussed by the court. The Supreme Court has said, however, that when a court “evaluat[es] the strength of only one party’s evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt.” Holmes v. South Carolina, 547 U.S. 319, 331, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).
To be clear, if the question was whether there was sufficient evidence to convict Jensen, the answer would be “yes.” But the harmless error test does not focus just on the sufficiency of other evidence. The question as we conduct thé Brecht analysis’ is whether we are in “ ‘grave doubt about whether a trial error of federal law had “substantial and injurious effect or influence in determining the jury’s verdict.” ’ ” Ayala, 135 S.Ct. at 2198 (quoting O’Neal, 513 U.S. at 436, 115 S.Ct. 992 (emphasis added)). So we must look' at the influence the improperly admitted handwritten letter and accusatory statements to the police had on the verdict. In this analysis “we look to ‘a host of factors,’ such as ‘the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.’ ” Jones, 635 F.3d at 1052 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).
The letter, a handwritten letter, penned just two weeks before her death, was unlike anything else in evidence. It came straight from Julie, shortly before her death. (At least according to the State— there was some question at trial as to its authenticity.) And it played a key role in the trial from the outset. The jury first heard about the letter early in the State’s opening statement, when it read the letter in its entirety out loud for the jury to hear. The State used Julie’s own words from the letter and her statements to Officer Kosman in its opening statement to underscore its themes of fear, motive, and absence of intent to take her own life. In light of the pretrial ruling that the letter would be allowed into evidence, the defense addressed the letter in its opening as well, even presenting it as a large exhibit. Defense counsel accurately in its opening statement told the jury that “[w]e’ll come back to the letter many times during this case, and you’ll have to decide whether it’s a blueprint for framing her husband or legitimate.”
The letter was also the last thing the State left in the jury’s mind before it deliberated Jensen’s fate, as the State’s end to its rebuttal closing argument focused on the letter. (It had also highlighted the letter and Julie’s statements to the police in other parts of its closing argument.) In its final arguments to the jury the State stressed that the letter contained Julie’s own thoughts: “So here was her unexpressed thoughts. She wrote them down, and she hid them away.... Hid them away until a time when she could resolve *905 this terrible dilemma she was in” The State also emphasized here that the jury-should believe the letter because it contained Julie’s own words: “It was a thought which was only to be expressed upon her death, because she wanted the world to know the truth. She wanted you to know the truth.” The State told the jury to believe the letter because Julie would not have lied: “At the time she wrote those words Julie had no motive to lie. She was hoping and she was praying nobody would ever see these words.” The State, in its final words, left the jury with words from the letter: “She hoped, she prayed that would not happen. But as she indicated, however, I will not leave David and Douglas, my life’s greatest love, accomplishment and. wish. That’s why she stayed. Dr. Spiro doesn’t understand that. Well, there’s a lot of things that Dr. Spiro doesn’t understand. The important thing is that you do. Thank you.”
The prosecution’s choice to end its closing arguments with the letter reflects its importance in the prosecution’s case. The letter was a unique piece of evidence. No other piece of evidence had the emotional and dramatic impact as did this “letter from the grave.” While some of the statements in the letter also came out through other witnesses at trial, only the letter contained words straight from Julie. And what words they were. Julie’s handwritten letter said her husband would be her first suspect if anything were to happen to her, along with emotionally compelling statements that she would never take her life or leave her children. The themes in the letter that Julie identified — she was caught up in an unhappy marriage, Jensen was still bitter about her affair, it was just Jensen who used the internet, she would never take her life because she loved her children too much, she feared Jensen was plotting her murder — were the same themes that the State developed throughout trial. Cf. United States v. Brown, 490 F.2d 758, 781 (D.C.Cir.1973) (“The statement presented all the classic hearsay dangers and abuses. Here was that voice from the grave casting an incriminating shadow on the defendant ... The damaging evidence stands impregnable — irretrievably lodged in the jurors’ minds-.”).
Recognizing the significance of the letter, the prosecutor did not merely ask one witness to discuss the letter’s contents; rather, it displayed the handwritten letter itself on the screen and asked the jury to read it. Twelve witnesses testified about the letter, including five experts. Notably, state medical experts Dr. Mainland and Dr. Long relied on the letter to support their medical opinions that Julie’s death was a homicide. Dr. Long testified that the letter and Julie’s other statements to police regarding fearing for her life from her husband were two of the reasons for his conclusion that Julie’s death was a homicide. And Dr. Mainland testified that “every sentence in the letter influenced” her, and that the sentence in the letter that Julie would not take her own life because of her children was especially influential in her opinion that the death was a homicide. The police and the Wojts also testified about the letter. The letter was also shown to Jensen during a video-recorded interrogation, and the State emphasized Jensen’s reaction to the letter in its closing. The letter also came up during the jury deliberations — the jury’s second note in its thirty hours of deliberations requested the letter.
Indeed, the importance of the letter in the State’s case was emphasized over and over by the State as it repeatedly fought to get the letter admitted. In pretrial litigation, the State called the letter an “essential component of the State’s case,” “highly relevant to the central issues of this case: suicide, motive, and fear,” and of “extraordinary value.” It also called the letter’s *906 admissibility “a make or break issue” from the State’s perspective. While the Wisconsin appellate court found the improperly admitted evidence added “nothing significant beyond the properly admitted nontestimonial statements,” Jensen II, 794 N.W.2d at 499, in addition to all that we discussed, the State’s own words reflect the importance of the letter to its case and the unreasonable nature of the appellate court’s finding of harmless error.
In assessing whether the improperly admitted evidence had a substantial and injurious effect on the verdict, we are concerned with the overall strength of the prosecution’s case, not merely the evidence in its favor. Jones, 635 F.3d at 1032. Although the state appellate court discussed the State’s evidence at length, it did not engage with the defense evidence. As the district court observed, “A reader of the court of appeals’ opinion would conclude that Jensen called no witnesses, introduced no evidence, never questioned the credibility of any witness, and never even elicited helpful testimony from a prosecution witness.” But that is far from what actually happened during the six-week trial.
While the Wisconsin appellate court referred to “untainted and undisputed gripping evidence against Jensen,” Jensen II, 794 N.W.2d at 494, the “undisputed” evidence in the case was all circumstantial and subject to more than one interpretation. Even the computer evidence, which the appellate court called the most incriminating evidence against Jensen, was not conclusive. The State presented evidence of searches for various means of death (poisoning, botulism, pipe bombs, and mercury fulminate, and one visited website explained how to reverse the polarity of a swimming pool, which the Jensens had), testimony from her son’s teacher that Julie and her son had both said Julie did not know how to use a computer, and testimony that there was no internet use on the home computer in November 1998 from Monday through Friday between 9 a.m. and 6 p.m., while Jensen was at work, ñor was there internet use during days when he was at a conference out of town.
But no evidence precluded a jury from finding that Julie did at least some of the internet searches, including those for ethylene glycol poisoning. In addition to the pro-prosecution evidence discussed by the appellate court, the jury also heard from Julie’s best friend, who testified that Julie used the computer to conduct research and for household bookkeeping. Julie’s resume stated that she had performed “online security order entry” while working at Dean Witter. She had also obtained a Series Seven broker’s license that allowed her to place and accept stock trades. That evidence was consistent with Jensen’s statement to investigators denying any knowledge of the internet searches for poison and stating that Julie also used the internet and accessed the computer. Moreover, that the home computer’s internet search history was deleted is equally consistent with both Julie trying to hide evidence of her suicide and with Jensen trying to hide evidence of murder. And no searches for poisons were found on Jensen’s work computer, which one might have expected if he were the person doing that search on the home computer.
This case was no slam dunk. The evidence was all circumstantial. And there was significant evidence in support of Jensen’s theory that Julie had taken her life, evidence not discussed at all by the Wisconsin appellate court. For example, she had visited her doctor, Dr. Richard Borman, two days before her death. Dr. Borman testified that she was “highly upset” and “seemed depressed and distraught and almost frantic, actually.” The jury heard that Dr. Borman prescribed the anti-depressant Paxil, which can worsen a de *907 pressed person’s symptoms. Julie became ill the day after she saw Dr. Borman, starting in the early hours of the day, and by mid-morning Jensen had gone to see Dr. Borman. Jensen expressed concern that Julie was suffering from Paxil’s side effects including sleeplessness, and Dr. Borman prescribed a sleep aid. It was while Jensen was away seeing Dr. Borman that Julie phoned Mrs. Wojt to say not to worry if she did not see Julie outside that day, another significant piece of evidence •that supported the defense’s suicide theory. A jury could infer that once Jensen left for the doctor, Julie put her suicide plan into action, including calling Mrs. Wojt and going on the computer to search for ethylene glycol poisoning. (There was an internet search for ethylene glycol poisoning at 9:45 am that day, when the defense said Jensen was away seeing Dr. Borman.)
Nor did the state appellate court discuss the significant credibility problems of seven-time convict Aaron Dillard, Jensen’s one-time cellblock mate whom the trial judge called the “top liar I’ve ever had in court.” Dillard, testifying at trial while awaiting his own sentencing, testified that Jensen admitted to him in prison that he had poisoned Julie and later suffocated her by pushing her face into a pillow. The medical professionals who opined for the very first time at trial that Julie was suffocated (Dr. Chambliss and Dr. Mainland) relied on Dillard’s account for the suffocation details. Dillard had in his cell a transcript of the lead detective’s interrogation of Jensen, and the trial judge recognized there was testimony from which the jury could conclude that Dillard was in and out of Jensen’s cell. Although the State argued that Jensen had confessed to his cellblock mate Dillard, if the transcript was in Jensen’s cell, that could have been the way Dillard obtained the details.
The state appellate court also did not discuss the testimony of Dr. Herzl Spiro, who examined Julie’s mental health records and interviewed persons close to her. He testified that Julie was suffering from a major depressive disorder that was complicated by anxiety and agitation with possible delusional features, and he concluded that she posed a significant suicide risk and that it was more likely that Julie’s ingestion of antifreeze was the result of suicidal intent rather than homicide or accident.
The state appellate court noted the testimony from Edward Klug who said that during a late-night gripe session with Jensen about their wives, Jensen said that if one wanted to get rid of his wife, there were websites instructing how to kill her with undetectable poison. But the court did not discuss the fact that Klug had not come forward with this account until nine years after Julie’s death, despite the large amount of publicity surrounding the case. The state appellate court was concerned only with the evidence in the prosecution’s favor, while the proper concern is with the overall strength of the prosecution’s case. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431; Jones, 635 F.3d at 1032.[2]
*908 We conclude that after consideration of the correct standard of review, the improperly admitted letter and accusatory statements resulted in actual prejudice to Jensen. We recognize that “an unreasonable application of federal law is different from an incorrect application of federal law.” Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). But the state appellate court’s ruling was not simply incorrect. The state trial judge recognized this when he called the letter’s admittance “grave constitutional error” when he foresaw the Giles ruling. That the jury improperly heard Julie’s voice from the grave in the way it did means there is no doubt that Jensen’s rights under the federal Confrontation Clause were violated. Any reasonable jurist using the proper standard would have to find “grave doubt” about whether that violation is harmless. The error in admission had a substantial and injurious effect or influence in determining the jury’s verdict; it was one “well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Richter, 562 U.S. at 103, 131 S.Ct. 770. Because Jensen satisfies the Brecht standard, he necessarily satisfies the AEDPA standard of an unreasonable application of the Chapman harmless error standard. See Ayala, 135 S.Ct. at 2198; Fry, 551 U.S. at 120, 127 S.Ct. 2321. As a result, we agree with the district court that Jensen’s petition must be granted.
III. CONCLUSION
The judgment of the district court is AFFIRMED.

. There are serious reasons to question this finding, however. For example, the medical examiner Dr. Mary Mainland testified for the State during the forfeiture hearing that murder was likely, and she testified that Julie would have been too weak the day before she ' died to use the telephone. But at trial Dr. Mainland admitted that she had been "mistaken” in her testimony during the forfeiture hearing because Julie did in fact use the phone that day and had a telephone conversation with Mrs. Wojt.

. The dissent suggests that it is somehow irrelevant that the Wisconsin appellate court’s lengthy opinion ignored extensive evidence. But in Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), to which the dissent points, there was no state court opinion that explained the reasons for denying relief. Id. at 98, 131 S.Ct. 770. Here, however, the state court gave a detailed account of the “arguments or theories [that] supported ... the state court’s decision,” and that account matters to our analysis. Id. at 102, 131 S.Ct. 770; see Brady v. Pfister, 711 F.3d 818, 826 (7th Cir.2013) (explaining that even after Richter, federal courts must evaluate whether § 2254(d) satisfied in light of state court’s explanation); cf. Kubsch v. Neal, 800 F.3d 783, 803-07, 2015 WL 4747942, at *17-19 (7th Cir. Aug. 12, 2015) (discussing review where state court rationale is incomplete). The actual arguments and *908 theories supporting the state appellate court’s decision convince us that its error was “well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Richter, 562 U.S. at 103, 131 S.Ct. 770.