In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1838

KEVIN CZECH,

*Petitioner-Appellant*,

*v.*

MICHAEL MELVIN, WARDEN
PONTIAC CORRECTIONAL CENTER,

*Respondent-Appellee*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14-cv-02012 — **Robert W. Gettleman**, *Judge*.

_____

ARGUED FEBRUARY 14, 2018 — DECIDED SEPTEMBER 21, 2018

_____

Before EASTERBROOK and ROVNER, *Circuit Judges*, and
GRIESBACH, *District Judge*.*

GRIESBACH, *District Judge*. An Illinois jury convicted Kevin
Czech of first-degree murder and aggravated discharge of a

_____

* Of the Eastern District of Wisconsin, sitting by designation.

firearm for his role in a drive-by shooting that resulted in the death of a fourteen-year-old bystander. Czech argued on direct appeal that his trial counsel was ineffective for failing to challenge the felony murder instruction that was submitted to the jury in conjunction with a general verdict. The Illinois Appellate Court determined that the felony murder instruction violated Illinois law, but concluded the error was harmless. The Supreme Court of Illinois declined further review. After an unsuccessful motion for post-conviction relief on other grounds, Czech sought federal collateral relief under 28 U.S.C. § 2254. The district court denied relief, reasoning that, although the conviction violated clearly established federal law, the error did not have a substantial and injurious effect on the jury's verdict. We affirm.

## I. Background

On September 24, 1999, fourteen-year-old Alonzo Zuniga was shot and killed in a drive-by shooting in Chicago by members of the Maniac Latin Disciples (MLD) directed at the Latin Kings, a rival gang. By all accounts, Zuniga was an innocent bystander not affiliated with either gang. In the course of their investigation, Chicago police quickly learned that the shooter was thirteen-year-old Marquis Falls. Though too young to be a full member of the MLD, Falls was considered a "pee-wee" member and had been assigned the task of holding a .357 revolver for the gang. The driver of the car was eighteen-year-old MLD member Roberto Mejia. Other occupants included Mejia's girlfriend, fifteen-year-old Nancy Malaves, and Czech, who was then twenty years old and also a member of the MLD.

Based on evidence that he had planned the "drive-by" and directed Falls to shoot at the rival gang members, Czech was

charged with first-degree murder and aggravated discharge of a firearm on the theory that he was legally responsible for Falls' actions. At trial, the court instructed the jury on four ways in which it could find Czech guilty of first-degree murder. One of the options, felony murder, required that the victim be killed during the commission of another felony, in this case, the crime of aggravated discharge of a firearm. The jury returned a general verdict, finding Czech guilty of first-degree murder and aggravated discharge of a firearm.

In the meantime, after Czech was convicted but before his appeal, the Illinois Supreme Court held in *People v. Morgan* that aggravated discharge of a firearm could not serve as the predicate felony of a felony murder conviction. 758 N.E.2d 813 (Ill. 2001). The Court noted that if every death caused by the aggravated discharge of a firearm could be charged as felony murder, "[t]he result could be to effectively eliminate the second degree murder statute and also to eliminate the need for the State to prove an intentional or knowing killing in most murder cases." *Id.* at 838 (internal quotations omitted). To avoid this result, the Court concluded that "where the acts constituting [the underlying felony] arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Id.* In other words, the aggravated discharge of a firearm could not serve as the underlying felony in a felony murder conviction if it did not have an independent felonious purpose.

On direct appeal, Czech argued that his trial counsel provided ineffective assistance of counsel in failing to object to the jury instruction on felony murder. Czech claimed that the trial court erred in instructing the jury that it could find him guilty of first-degree murder based on a felony murder theory

in light of *Morgan*. The Illinois Court of Appeals agreed that the instruction was improper under Illinois law because the acts establishing the crime of aggravated discharge of a firearm arose from and are inherent in the act of murder. It nevertheless found the error to be harmless, explaining that under Illinois law the court must presume that the jury convicted Czech of the most serious crime charged, intentional or knowing murder. The court also concluded that "[b]ased on the overwhelming evidence of defendant's guilt in the record, it is not reasonably likely that, but for this error, the decision reached would have been different." Supplemental Appendix (SA) 19–20. Because the error was harmless, the court concluded Czech's ineffective assistance of counsel claim failed.

Czech then filed a *pro se* petition for habeas corpus pursuant to 28 U.S.C. § 2254, challenging his murder conviction. As relevant here, Czech argued that the inclusion of the felony murder instruction violated his due process rights. The district court appointed counsel and found that the general verdict conviction violated clearly established federal law because it contained an improper method of conviction. The court nevertheless concluded that Czech was not entitled to relief. It reasoned that the error did not have a substantial and injurious effect on the jury because the evidence of his guilt was overwhelming. The district court thereupon denied Czech's petition in its entirety but granted Czech a certificate of appealability on the issue of whether the inclusion of the improper felony murder instruction resulted in harmless error.

## II. Analysis

We review the district court's denial of a petition for writ of habeas corpus *de novo*. *Carter v. Thompson*, 690 F.3d 837, 843

(7th Cir. 2012). In considering habeas petitions that challenge state court convictions, "[o]ur review is governed (and greatly limited) by the Anti-terrorism and Effective Death Penalty Act of 1996 ('AEDPA')." *Hicks v. Hepp*, 871 F.3d 513, 524 (7th Cir. 2017) (citation omitted). Pursuant to the statute, habeas relief cannot be granted for persons in custody pursuant to a judgment of a state court unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## A. Due Process

In this case, Czech contends that, because the felony murder instruction was invalid as a matter of state law, its inclusion in the general verdict returned by the jury violated his right to due process. The issue, then, is whether a jury instruction that departs from state law necessarily violates the Constitution. We have been down this road before.

In *Falconer v. Lane*, 905 F.2d 1129 (7th Cir. 1990), the petitioner argued that the trial court violated her constitutional rights by giving the same combination of murder and voluntary manslaughter instructions that was found to violate Illinois state law in *People v. Reddick*, 526 N.E.2d 141 (Ill. 1988). In *Reddick*, the Illinois Supreme Court held that, under Illinois law, it was "grave error" for a court to give murder and voluntary manslaughter instructions without warning the jury that to return a verdict of murder, the state must prove beyond a reasonable doubt that the "manslaughter defenses" are without merit. In considering Falconer's petition for

federal habeas relief, this court found the jury instruction er-
ror redressable under the Constitution as a violation of the
defendant's due process right. We explained that when the Il-
linois Pattern Jury Instructions for murder and voluntary
manslaughter were given together, the jury may have been
left with the false impression that it could convict the peti-
tioner of murder even if she possessed a mitigating mental
state described in the voluntary manslaughter instruction. 905
F.2d at 1136. "Explicit misdirection on this scale," we held,
"violates the constitutional guarantee of due process." *Id.* at
1137.

In *Gilmore v. Taylor*, the Supreme Court held that the
"new" rule this court announced in *Falconer* could not provide
the basis for retroactive federal habeas corpus relief. 508 U.S.
333 (1993). Applying *Teague v. Lane*, 489 U.S. 288 (1989), the
Court found that the *Falconer* rule was not compelled by
"precedent existing at the time the defendant's conviction be-
came final." 508 U.S. at 340 (citation omitted). Notably, *Gil-
more* did not say whether *Falconer* was correctly decided; nor
did it expressly overrule *Falconer*. But in reversing this court's
retroactive application of *Falconer*, the Court expressed its dis-
agreement with this court "that our precedent foreordained
the result in *Falconer* … ." *Id.* at 344. *Gilmore* also noted that
"[o]utside of the capital context, we have never said that the
possibility of a jury misapplying state law gives rise to a fed-
eral constitutional error. To the contrary, we have held that
instructions that contain errors of state law may not form the
basis for federal habeas relief." *Id.* at 342 (citing *Estelle v.
McGuire*, 502 U.S. 62 (1991)).

From this pre-AEDPA line of cases, the "clearly estab-
lished federal law"—that is, law "determined by the Supreme

Court of the United States," 28 U.S.C. § 2254(d)(1)—appears to be that "instructions that [only] contain errors of state law may not form the basis for federal habeas relief." *Gilmore*, 508 U.S. at 342 (citation omitted); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). But in this case Czech contends, and the district court found, that the state court rendered decisions contrary to the clearly established federal law set forth in *Stromberg v. California*, 283 U.S. 359 (1931), and *Yates v. United States*, 354 U.S. 298 (1957). He relies on *Stromberg* and *Yates* for the proposition that a general verdict returned by a jury that has been instructed on alternative grounds for finding the defendant guilty, one of which is improper under state law, violates his federal right to due process. The respondent, on the other hand, contends that neither *Stromberg* nor *Yates* clearly established the constitutional claim on which Czech relies.

In *Stromberg*, the defendant was charged with violating California Penal Code 403a for displaying a red flag or banner in a public place as a sign, symbol, or emblem used to oppose organized government, to invite anarchistic action, or to aid seditious propaganda. 283 U.S. at 361. The court instructed the jury that the defendant could be convicted if the flag was displayed for any of these three purposes. The jury convicted the defendant for violating the statute in a general verdict that did not indicate which part of the statute the defendant had violated. The Supreme Court found that a conviction based on the first clause—displaying a flag that was a symbol of opposition to organized government—violated the defendant's First Amendment right to free speech. The Court then considered whether the jury's general verdict should be set aside, noting that if "any of the clauses in question is invalid under

the Federal Constitution, the conviction cannot be upheld." *Id.* at 368. The Court reversed the defendant's conviction because it was impossible to determine whether the conviction rested upon the invalid criminal charge. *Id.* at 370. *Stromberg* thus stands for the principle that "where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." *Griffin v. United States*, 502 U.S. 46, 53 (1991). It clearly does not apply here.

The Supreme Court extended *Stromberg*'s holding twenty-six years later to a federal prosecution in *Yates*. There, the defendants were charged in a single count with a Smith Act conspiracy advocating the overthrow of government and organizing, as the Communist Party, a society of citizens to overthrow the government. 354 U.S. at 300. The defendants were convicted, but the jury's general verdict did not indicate whether it found the defendants guilty of the "advocating" charge or the "organizing" charge. The Court concluded that the "organizing" charge was barred by the Smith Act's three-year statute of limitations. Without referring to the Due Process Clause, the Court cited *Stromberg* and held that a general verdict must be set aside where it "is supportable on one ground, but not on the other, and it is impossible to tell which ground the jury selected." *Id.* at 312. The Court therefore reversed the conviction because it was unclear whether the conviction rested on the time-barred "organizing" charge.

The Court questioned the extension of its holding in *Stromberg* to *Yates* in *Griffin*, describing it as "an unexplained extension, explicitly invoking neither the Due Process Clause (which is an unlikely basis) nor our supervisory powers over the procedures employed in a federal prosecution." 502 U.S.

at 55–56. In *Griffin*, also a federal prosecution, the Court was confronted with the question of whether the Due Process Clause of the Fifth Amendment required that a general verdict of guilty on a multiple-object conspiracy charge in a federal prosecution be set aside if the evidence is inadequate to support conviction as to one of the objects submitted to the jury. In holding that it did not, the Court rejected the argument that *Yates* had overturned the long-standing common law rule that "a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds-even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action." *Id.* at 49. Though *Griffin* did not overrule *Yates*, the Court declined to extend its holding to cases in which "one of the possible bases of conviction was neither unconstitutional as in *Stromberg* nor even illegal as in *Yates*, but merely unsupported by sufficient evidence." *Id.* at 56.

This appeared to be the law in 2004 when the Illinois Appellate Court rejected Czech's claim of error and affirmed his conviction. No Supreme Court precedent clearly established that a conviction entered on a general verdict was unconstitutional merely because the jury instructions included a legal theory that was invalid under state law. Indeed, *Gilmore* at least suggested that it did not. *Stromberg* stood only for the narrow proposition that a general verdict must be set aside when one of the possible bases for conviction was unconstitutional. And while *Yates* had applied that rule to federal prosecutions in which a possible basis of conviction was legally improper, it was unclear whether its holding was grounded in the Due Process Clause. Normally, that absence of clearly established federal law at the time the state court decided the case would be dispositive. But further delay in the exhaustion

of Czech's state court remedies and a more recent decision by the Supreme Court added an additional wrinkle to his case.

As noted above, the Illinois Appellate Court issued its decision rejecting Czech's claim of instructional error and affirming his conviction in 2004. After the Illinois Supreme Court denied Czech's petition for leave to appeal, Czech returned to the trial court with a motion for post-conviction relief on grounds not relevant here. The trial court's order denying that motion was finally affirmed by the Appellate Court on March 26, 2013, and again the Illinois Supreme Court denied review. It was at that point that Czech filed his petition for federal relief under § 2254.

In the meantime, while Czech's motion for post-conviction relief on other grounds was pending in the state courts, the Supreme Court decided *Hedgpeth v. Pulido*, 555 U.S. 57 (2008). In *Hedgpeth*, the Court vacated the Ninth Circuit's decision affirming the district court's grant of § 2254 relief on the ground that the state court's felony murder jury instructions on multiple theories of guilt, one of which was invalid under state law, violated the petitioner's constitutional rights. The lower courts had granted the petition without considering whether the petitioner suffered any prejudice, holding that the instruction constituted structural error that requires that the conviction based on a general verdict be set aside regardless of whether the error resulted in prejudice. In vacating the Ninth Circuit's decision, the Court held that such an error was not structural and relief was not warranted unless a reviewing court found that "the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 58 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). The Court then remanded the case back to the lower

court to determine in the first instance whether the error was harmless.

In light of *Hedgpeth*, the district court's conclusion that *Yates* constitutes clearly established federal law was understandable. At first glance, it appears that the Court implicitly accepted the lower courts' conclusion that *Yates* was based on constitutional error, *id.* at 60, a conclusion it had found "unlikely" in *Griffin*. 502 U.S. at 56. After all, if there was no violation of federal law, then there was no need to reach the issue of whether the violation was structural and remand the case for a determination of whether the error was harmless. Instead of overturning the lower court's ruling that constitutional error had been shown, *Hedgpeth* let stand the lower courts' ruling that *Yates* constituted clearly established federal law that jury instructions on multiple theories of guilt, one of which is invalid under state law, is a violation of due process. *See also Sorich v. United States*, 709 F.3d 670, 673 (7th Cir. 2013) ("The Supreme Court ruled in *Yates v. United States*, 354 U.S. 298 (1957), that constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may have relied on a legally invalid one."). And since *Yates* preceded Czech's conviction by more than forty years, the district court understandably concluded that the jury instructions in his case likewise violated clearly established federal law and proceeded to determine whether the error was harmless under *Brecht*.

It is important to note, however, that the Court in *Hedgpeth* did not expressly hold that instructing a jury on multiple theories of guilt, one of which is legally improper, is a constitutional error. Instead, the Court addressed only the narrow issue of whether such an error is subject to harmless-error

review. We question whether "clearly established federal law" can be established by implication. But even assuming it can be established in this manner, we are satisfied that Czech is not entitled to relief here. This follows because, even if constitutional error was shown, the district court correctly found it to be harmless.

## B. Harmless Error

On habeas review, a constitutional error is considered harmless unless it can be shown to have "had substantial and injurious effect or influence in determining the jury's verdict." *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011) (quoting *Brecht*, 507 U.S. at 622). That is, petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637. "We apply this 'actual prejudice' standard regardless of whether the state appellate court determined that the error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967)." *Jones*, 635 F.3d at 1052; *see also Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) ("[T]he *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007))). When making a determination under *Brecht*, the reviewing court must make a "*de novo* examination of the record as a whole" to decide whether a properly instructed jury would have arrived at the same verdict, absent the error. *Jenkins v. Nelson*, 157 F.3d 485, 495 (7th Cir. 1998). If a habeas court "has so much as a 'grave doubt as to the harmlessness of [a constitutional error], it should grant relief.'" *Jones*, 635

F.3d at 1052 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 439 (1995)).

In this case, the jury was instructed that a person commits the offense of first-degree murder when he kills an individual if in performing the act which caused the death he (1) intends to kill; (2) intends to do great bodily harm to that individual or another; (3) knows that his acts will create a strong probability of death or great bodily harm to the individual or another; or (4) is committing the act of aggravated discharge of a firearm. SA 354. Only the fourth basis for a finding of guilt on the crime of aggravated discharge of a firearm was improper. A finding of guilt on any of the three remaining bases offered by the court would have been proper. To decide whether the error was harmless, then, we must examine the record as a whole to determine whether one or more of the lawful bases for a finding of guilt "was overwhelmingly established by the evidence, such that a rational jury, absent the error, would have arrived at the same verdict." *Jenkins*, 157 F.3d at 495. From our review of the entire record, we agree with the district court that the evidence against Czech was overwhelming and that a reasonable jury would have reached the same verdict on at least two of the remaining bases.

There was no dispute that Czech was in the car with Mejia, Malaves, and Falls when Mejia drove past the gathering of Latin Kings and Falls opened fire on them. Czech admitted as much and more in his own statements to police. SA 225–30, 241–42. The only real question was whether it was Czech who directed Mejia to drive by the Kings' location and ordered thirteen-year-old Falls to shoot at them.

Falls, who had pled guilty to the murder of Zuniga in juvenile court, testified that it was Czech who originally gave

him the .357 revolver to hold and who told him to retrieve it from the alley where he had hidden it on the night of the shooting. SA 108–16. According to Falls, Czech told him "he needed a gun to go and shoot at the Kings." SA 116, 118. As they approached the street where the Kings were gathered, Czech, who was seated in the back seat on the driver's side of the car, instructed Falls that if the Kings were on his side of the car he would shoot, and if they were on the passenger side, Falls would shoot. SA 119. When it turned out they were on the passenger side, Czech handed the gun to Falls. As Mejia drove around the block, Falls switched seats with Malaves, who was seated in the front passenger seat, because the rear window would not roll down completely. SA 122. Then, as they drove by the Kings again, Czech pointed out a gang member named Chino and told Falls to shoot. Falls estimated that he fired five shots, and as they sped away, Czech was shouting "D love, King Killer, stuff like that." SA 123.

Malaves, who was fifteen-years-old at the time of the shooting, corroborated much of Falls' account. Malaves testified that Mejia, who was her boyfriend at the time, planned to take her to a movie that evening with Czech and his girlfriend. The plan changed, however, when they picked up Czech in Mejia's car. Upon entering the car, Czech told Mejia they were going to "cruise by the Kings." SA 70. But first, Czech told Mejia they had to pick up Falls. After they picked up Falls, Mejia was directed to the alley where Falls retrieved the gun. When Falls got back into the car, Czech directed Mejia to drive to Monticello and Drake, where the Kings were gathered. Malaves testified that as they drove by the Kings, Czech rolled down his window, made King gang signs and yelled "King love," in an apparent attempt to lull them into a false sense of security. SA 73–77. They then went around the block and

Malaves climbed into the back seat and changed places with Falls. As they approached the gathering of Kings again, Czech told Malaves to cover her ears because she was about to hear a loud noise. Malaves testified that she ducked down on the floor and heard gunshots and Czech screaming "King Killer" and "Maniac love." SA 79–80.

Although Czech argues that Malaves' testimony does not fully support Falls' account, we find no significant inconsistencies from our review of the transcript. Malaves was unable to recount all of what Czech said to Falls while they drove to where the shooting occurred, but she explained that this was in part because she was not paying attention and also because Czech and Falls were in the back seat and the car radio was playing loudly. SA 105–06. What she did recount supports the conclusion that it was Czech's idea to drive by where the Kings were gathered, Czech knew Falls was going to shoot before the shots were fired, and Czech approved of Falls' actions. Further support was provided by the Chicago Police detective who interviewed Czech and testified that Czech admitted that he told Mejia to drive to the Kings' territory but first had him pick up Falls who retrieved the gun. SA 225–27. According to the detective, Czech also admitted that he shouted "D Killer" and "King Love" when they drove past the Kings gathering the first time, and then told Falls to switch seats with Malaves before they drove past the Kings the second time because the rear windows did not roll down all the way. He also admitted he told Malaves to cover her ears and keep her head down before Falls fired the gun out the window. Although Czech was less forthcoming in his videotaped interview, the earlier version recounted by the detective provided strong support for Falls' and Malaves' testimony. Viewing the record as a whole, there was ample evidence that

Czech directed Falls to shoot at the Kings and intended or, at a minimum, knew there was a strong probability of death or great bodily harm.

Czech nevertheless argues that the inclusion of the felony murder instruction had a substantial and injurious effect on the jury's verdict because the prosecution emphasized the instruction as part of its theory of the case. Relying on *Jensen v. Clements*, 800 F.3d 892 (7th Cir. 2015), Czech argues that the fact that the prosecution emphasized the felony murder instruction in its closing requires the conclusion that the error was prejudicial. *Jensen* involved a letter written by the defendant's wife before her death accusing him of her murder. There was no dispute that the admission of the letter at trial violated the defendant's confrontation rights under the Sixth Amendment. The sole issue before us was whether the admission of the letter was prejudicial. In holding that it was, we noted that the "letter from the grave" had played a key role in the case from the outset, the prosecution had emphasized in its closing, and the evidence was "all circumstantial and subject to more than one interpretation." *Id.* at 905–06. We thus concluded that the admission of the letter had a substantial and injurious effect on the verdict.

Here, we are not dealing with a powerful piece of incriminating evidence that formed the centerpiece of the prosecution's case, but one of four separate theories of liability. We do not agree that the prosecution's primary theory at trial was that Czech was guilty of first-degree murder under the felony murder instruction or that the instruction was the center of the prosecution's case as the letter was in *Jensen*. The prosecution predominately urged the jury to convict on a theory of knowing or intentional murder. After analyzing how the State

had met the elements of this theory, the prosecution explained that felony murder was a final option the jury could consider if the jury was "inclined to give [Czech] the benefit of any conceivable doubt." SA 317. The mere fact that the prosecution offered felony murder as a fallback argument does not mean the evidence establishing guilt under the alternative theories was lacking. In any event, under *Brecht*, it is the strength of the evidence as a whole, and not the closing argument of the prosecution, that determines whether the error was harmless.

From our review of the evidence as a whole, we conclude that a properly instructed jury would have arrived at the same verdict. We cannot say that the inclusion of the felony murder theory in the general verdict "had substantial and injurious effect or influence in determining the jury's verdict" or resulted in actual prejudice to Czech. *Brecht*, 507 U.S. at 622. We thus conclude that the error, assuming it was of constitutional magnitude, was harmless. The judgment of the district court is therefore affirmed.