In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3702

RUSSELL ARMFIELD,

*Petitioner-Appellant*,

*v.*

SONJA NICKLAUS, Warden,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-03331 — **Thomas M. Durkin**, *Judge*.

ARGUED OCTOBER 30, 2020 — DECIDED JANUARY 11, 2021

Before MANION, ROVNER, and SCUDDER, *Circuit Judges*.

MANION, *Circuit Judge*. Russell Armfield, along with Kimothy Randall and Tyrene Nelson, was charged with first-degree murder in Illinois state court for the 2004 shooting death of Al Copeland in southwest Chicago.

The jury convicted Armfield. He appealed the conviction on the grounds that a transcript disclosed inadvertently to the jury violated his constitutional rights under the Sixth

Amendment's Confrontation Clause. He lost. He then pursued a collateral attack in state court alleging ineffective assistance of counsel. He lost again. He then filed for federal habeas relief via 28 U.S.C. § 2254. The district court denied relief and Armfield appeals.

Although Armfield's positions have been well briefed and argued by appointed counsel, we affirm denial of habeas relief on Armfield's Confrontation Clause claim because the state's strong case against him renders any constitutional error harmless. We also reject Armfield's ineffective assistance claim; he cannot show trial counsel's shortcomings resulted in prejudice.

## I. Background

Around 6:00 pm on August 17, 2004, Kimothy Randall opened fire on Al Copeland's vehicle while Copeland drove by. Copeland's car was struck by gunfire, as was a bystander's vehicle. No one was injured. Russell Armfield and Tyrene Nelson were present.

Later that evening, between 8:00 and 9:00 pm, while riding with Armfield and Nelson in a car driven by Randall's girlfriend, Randall spotted Copeland again. Randall told his girlfriend to drive to his residence, where Armfield and Nelson armed themselves. They tracked down Copeland as he drove away from his own girlfriend's home. As Copeland approached an intersection, Randall gave the signal: shoot Copeland. Armfield and Nelson sprang from their car, ran toward Copeland, and fired multiple shots into his vehicle, killing him.

The state charged Armfield, Randall, and Nelson with first-degree murder. Armfield and his codefendants

proceeded to trial before two juries—one jury for Armfield and Randall, the other for Nelson. The two trials, though separate, occurred simultaneously before the same judge, with the juries and defendants shuffling in and out depending on the evidence presented.[1]

No doubt this arrangement contributed to the mishap at the center of this habeas petition. During deliberations, the Armfield/Randall jury requested a transcript of certain witnesses' testimony. The court, by mistake, tendered a trial transcript containing the prosecutor's opening statements from Nelson's case. The Armfield/Randall jury had not heard this version. Therein, the prosecutor referenced a videotaped statement from Nelson that purported to implicate all three defendants in the murder:

> And, ladies and gentlemen, you're also going to see a statement given to a Cook County assistant state's attorney that was videotaped of [Nelson] confessing to shooting Al Copeland and laying out essentially the same facts that I just told you. You will see him tell you how he and his partners murdered Al Copeland in his own words.

---

[1] Trial courts sometimes employ this practice to increase efficiency. Simultaneous trials can circumvent the need for duplicate presentation of overlapping evidence. But their use does not come risk-free. Here, the trial court's confusion between two transcripts spawned years of postconviction litigation in state and federal court. Whatever resources the trial court hoped to save were cancelled out long ago by the tax on judicial economy. We take this opportunity to implore trial courts to exercise caution and diligence when holding simultaneous trials. The mistake at the center of this case was completely avoidable.

Supp. App'x at 164.

Neither this snippet nor Nelson's confession were presented as evidence of Armfield's involvement. For that, the state leaned primarily on eyewitness testimony rather than physical evidence.

Two witnesses placed Armfield, Nelson, and Randall at the 6:00 pm shooting scene. One of those witnesses actually saw Randall pull the trigger and believed Armfield acted as a lookout.

Grand jury testimony and a police statement from Randall's sister revealed how the defendants obtained guns just before they killed Copeland, though she recanted that story at trial.

Three more witnesses detailed the defendants' involvement in the fatal 9:00 pm shooting. Copeland's girlfriend and a bystander watched Armfield and Nelson shoot Copeland. The latter positively identified Armfield and Nelson as the shooters; he knew them from the neighborhood. Randall's girlfriend (the driver) told police and the grand jury Randall instructed Armfield and Nelson to shoot Copeland, and that when Armfield returned to the car, he admitted to firing his weapon. Like Randall's sister, she recanted this account on the stand.

Finally, the state introduced evidence regarding a subsequent shooting in March 2005 involving Nelson, following which police confiscated one of the firearms used in Copeland's murder. Armfield played no part in this shooting.

Neither Armfield nor Randall put on a defense, and none of the three defendants testified before the Armfield/Randall jury.

The jury convicted Armfield of first-degree murder.[2] He received a sentence of 33 years' imprisonment. Armfield appealed on grounds that disclosing the reference to Nelson's confession deprived him of a fair trial, along the lines of *Bruton v. United States*, 391 U.S. 123 (1968). The state appellate court acknowledged the error in allowing Armfield's jury access to opening statements from a separate trial. It nonetheless held this error non-reversible and further determined it to be harmless beyond a reasonable doubt. The Illinois Supreme Court denied review.

Armfield next launched a state collateral attack on the conviction. The basis: his trial counsel provided ineffective assistance in multiple respects, including by failing to move to exclude testimony about the March 2005 shooting that did not involve Armfield. The state appellate court rejected his claim for failure to satisfy prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). The Illinois Supreme Court denied review.

Armfield filed for federal habeas relief. The district court concluded the state appellate court did not unreasonably apply Supreme Court precedent to Armfield's Confrontation Clause claim or the related harmlessness analysis. Nor did the state court's prejudice determination unreasonably apply *Strickland*. We granted Armfield's request for a certificate of appealability on these two issues.

---

[2] The jury was also asked to determine whether Armfield personally discharged a firearm during the commission of the offense. The jury found he did not.

## II. Discussion

We review the district court's denial of federal habeas relief *de novo*, "but our inquiry is an otherwise narrow one." *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (*en banc*).

A federal court may grant habeas relief following an adjudication on the merits in state court only if that decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)–(2); *Schmidt*, 911 F.3d at 476–77.

This standard is difficult to meet. "Unreasonable means more than incorrect." *Winfield v. Dorethy*, 956 F.3d 442, 451 (7th Cir. 2020). The inquiry is "whether the decision was unreasonably wrong under an objective standard." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (*en banc*).

On both Armfield's claims, the Illinois Appellate Court issued the "last reasoned decision on the merits," so we afford its analysis deference so long as that analysis is reasonable. *Gage v. Richardson*, 978 F.3d 522, 529 (7th Cir. 2020). Habeas relief is warranted only if Armfield shows the state court's determinations were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Given this demanding standard of review, we cannot award Armfield the relief he seeks.

**A. Confrontation Clause**

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to be confronted with the witnesses against him, so that he may cross-examine their testimony and allow the jury to weigh their credibility. *Douglas v. Alabama*, 380 U.S. 415, 418–19 (1965).

Armfield's jury received information that Nelson made a videotaped statement implicating Armfield in the murder. Yet Nelson did not testify at Armfield's trial. This information reached the jury as would an *ex parte* affidavit or deposition, thus depriving Armfield of the opportunity to rebut Nelson through cross-examination. Armfield argues the disclosure amounted to a violation of his constitutional rights and should result in habeas relief.

The state appellate court acknowledged the "unquestionabl[e] … error by the trial court." Short App'x at 35. But it held the error did not create a constitutional violation contemplated by *Bruton v. United States*, 391 U.S. 123 (1968). Armfield claims this ruling was contrary to and unreasonably applied Supreme Court precedent, and that it rested on unreasonable determinations of fact.

i.   *Constitutional violation?*

In *Bruton*, at a joint trial for armed robbery, an investigator testified to a codefendant's confession that implicated petitioner. 391 U.S. at 124. The codefendant did not testify. The Court held the admission violated petitioner's constitutional right to cross-examine his codefendant. *Id.* at 126. This, despite jury instructions prohibiting the confession's consideration toward determining petitioner's guilt. The jury could not

reasonably be expected to ignore the confession, which added substantial strength to the prosecution's case.

The *Bruton* Court also placed great emphasis on the confession being admitted into evidence; it was not merely paraphrased through attorney statements or argument. Rather, the jury received its entire substance, as was true in *Douglas*, where the prosecutor read a codefendant's confession into the record "under the guise of cross-examination to refresh [the codefendant's] recollection" after the codefendant refused to answer questions about the crime. 380 U.S. at 416. That confession inculpated petitioner. Though reading the codefendant's confession did not technically qualify as testimony, doing so risked the jury equating it with evidence and created an inference that the codefendant actually made the statement. The inference could not be tested on cross-examination because the prosecutor was not himself a witness; nor could the codefendant be cross-examined on a statement "imputed to but not admitted by him." *Id.* at 419. This procedure denied petitioner his right of confrontation.

The situation in *Frazier v. Cupp*, 394 U.S. 731 (1969), presented far less a threat to petitioner's confrontation rights.[3] In that case, the prosecutor summarized anticipated testimony from petitioner's codefendant (who had already pled guilty to the same offense) during opening statements. The summary itself "was not emphasized in any particular way," but it referenced a confession made by the codefendant. *Id.* at 733. That testimony never materialized; the codefendant invoked his right against self-incrimination when he took the stand.

---

[3] The state appellate court did not consider *Frazier,* but the district court did.

Even if it had, the statement "was not a vitally important part of the prosecution's case," and the jury was instructed that opening statements must not be considered as evidence. *Id.* at 735.

These facts led the *Frazier* Court to conclude no constitutional violation had occurred. In so holding, the Court rejected the same general argument Armfield makes: the reference to his codefendant's confession in opening statements—albeit in Nelson's trial, not his own—"placed the substance of [Nelson's] statement before the jury in a way that 'may well have been the equivalent in the jury's mind of testimony.'" *Id.* at 734 (quoting *Douglas*, 380 U.S. at 419).

Resolving Armfield's Confrontation Clause challenge boils down to determining on which side of the *Bruton/Frazier* line his case falls.

Armfield maintains his conviction flies in the face of *Bruton* as well as analogous Supreme Court precedent addressing the use of redacted codefendant confessions at joint trials. For example, Armfield argues while the summary of Nelson's confession did not mention Armfield by name, that quasi redaction would still permit the jury to consider it against him. The prosecutor's summary stated "[Nelson] and *his partners* murdered Al Copeland." Having just sat through three days of testimony corroborating the state's theme that Armfield, Randall, and Nelson acted as a team, a juror at Armfield's trial "need only lift his eyes to [Armfield], sitting at counsel table," to figure out the identity of Nelson's "partners." *Gray v. Maryland*, 523 U.S. 185, 193 (1998) (holding confession redactions that obviously refer to defendant fall within *Bruton*'s protective rule); *but see Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[T]he Confrontation Clause is not violated by the admission

of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.").

Armfield further distinguishes his case from *Frazier* by claiming his jury received the substance of Nelson's confession, i.e., *how* Nelson and his partners murdered Copeland. Because his jurors had already heard testimony about the murder's details, Armfield argues the disclosure of the fact that Nelson confessed validated those facts in their minds.

On the flipside, Armfield's jury was not exposed to Nelson's confession itself. The wayward transcript contained only opening statements from Nelson's trial; it did not include evidence that Armfield's jurors did not observe.

Moreover, the allusion to Nelson's confession was generic and fleeting, occupying only seven lines of transcript text toward the end of the prosecutor's monologue. Nelson's confession (and the fact that he gave one) played no part in the prosecution's case-in-chief against Armfield. In addition, the trial judge instructed Armfield's jury to consider only evidence in the form of witness testimony, exhibits, and stipulations; the judge then gave a clear follow-up instruction that opening statements are not evidence.[4] These instructions did not present the same concerns outlined by the Court in *Bruton*. *See Frazier*, 394 U.S. at 736 ("Even if it is unreasonable to assume that a jury can disregard a coconspirator's statement when

---

[4] Query whether the jury would interpret this second instruction to prohibit treating opening statements from *Nelson*'s trial as evidence, or whether that instruction carried such force at all. We need not answer these questions given our holding.

introduced against one of two joint defendants, it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial.").

We need not answer whether the state appellate court unreasonably applied Supreme Court precedent or rested its decision on an unreasonable interpretation of the facts when it held the transcript mix-up caused no reversible constitutional error. Even were Armfield's Confrontation Clause rights violated, any such violation was harmless.

### ii. *Harmlessness*

Federal habeas relief "is appropriate only if the prosecution cannot demonstrate harmlessness." *Davis v. Ayala*, 576 U.S. 257, 267 (2015). And Armfield does not argue the jury's receipt of Nelson's trial transcript constitutes "the rare type of error" that overrides the harmlessness requirement. *See id.* (citing *Glebe v. Frost*, 574 U.S. 21, 23 (2014)).

Procedural posture determines how we assess harmless error. Courts reviewing cases on direct appeal may find a constitutional violation harmless only if the error was "harmless beyond a reasonable doubt." *Ayala*, 576 U.S. at 267 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Collateral proceedings like this one require more from the habeas petitioner. Armfield is "not entitled to habeas relief based on trial error unless [he] can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In other words, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

We employ *Brecht*'s "actual prejudice" test even if the state appellate court reviewed the matter through *Chapman*'s harmless-beyond-a-reasonable-doubt lens. *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011); *see also Ayala*, 576 U.S. at 268–70 (explaining the *Brecht* standard subsumes § 2254(d)'s requirements when a federal habeas petitioner challenges the state court's *Chapman* finding). We employ a *de novo* review of the entire record, asking "whether a properly instructed jury would have arrived at the same verdict, absent the error." *Czech v. Melvin*, 904 F.3d 570, 577 (7th Cir. 2018).

Note: harmless-error review is distinct from assessing whether there was enough evidence at trial to support a verdict. *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015). The question here is whether the error "had or reasonably may be taken to have had" a substantial influence on the jury's decision. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). When sizing up the state's case, we look at the case's overall strength, not just the evidence in the state's favor. *Jensen*, 800 F.3d at 906. For cases involving Confrontation Clause errors, we examine factors like the importance of the disclosed statements to the prosecution's case, whether the disclosure was cumulative, the presence of corroborating evidence, and the extent of cross-examination permitted. *Id.* at 904.

It's obvious Armfield had no chance to cross-examine Nelson (or anyone) about Nelson's statement to police. The short summary of Nelson's confession can also be considered mostly cumulative; the disclosed opening statement indicates the confession "lay[s] out essentially the same facts" as those making up the state's theory against Armfield. The summary filled no gaps in the state's evidence.

The bigger question here is what role, if any, the inadvertent disclosure played in the government's case. Based on the detailed, consistent testimony from several independent witnesses confirming Armfield's involvement, we cannot conclude the disclosure of Nelson's confession had or reasonably may have had a substantial influence on the jury's decision.

Two separate witnesses placed all three defendants at the 6:00 pm shooting. Willie Williams spotted Nelson pushing Randall in a wheelchair. Williams knew both men from the neighborhood. He watched as Nelson handed Randall a pistol. He saw Randall open fire on a gray Chevrolet. Williams also noticed a third man, later identified as Armfield, standing in a nearby alley. To Williams, it seemed Armfield was acting as a lookout.

Yakirah Robinson was driving her own car close to the gray Chevrolet. She saw Randall in a wheelchair with Nelson standing behind him. She saw Armfield nearby, too. She heard close-range gunshots and sped off without seeing who fired them. When she reached safety, Robinson noticed her car had been struck by at least one bullet. She made a police report and watched as Al Copeland spoke with law enforcement. His vehicle, a gray Chevrolet Cavalier, had also been shot.

Three hours later (around 9:00 pm) and a few blocks from the first shooting, Calshaun Vinson observed Copeland driving away from a restaurant. Vinson had known Copeland since childhood. Vinson also saw all three defendants in a black car. He could see Randall in the front passenger seat with Nelson and Armfield in the rear. He could tell Randall's girlfriend, Ayeshia Floyd, was driving. Vinson knew the three defendants.

The vehicle in which Vinson was riding came to a stop. From there, he could see Copeland's car approach a nearby intersection. Vinson watched Armfield and Nelson exit the black car and run toward the intersection. He saw them shoot at Copeland's car.

Copeland had just dropped off Kawana Jenkins and her three children at Jenkins's home. As Copeland drove away, Jenkins saw a young man flag him down. She saw Copeland open his car door. She saw the young man open fire on Copeland. She saw Copeland accelerate away, but as he reached an intersection, another individual emerged and began shooting at Copeland. Copeland crashed. Jenkins ran to his car and found him slumped over.

The assailants shot Copeland five times. He died before reaching the hospital.

Physical evidence collected from the murder scene supported this two-shooter narrative. Investigators found bullet fragments and spent cartridge cases of two different calibers, 9mm and .40 caliber, fired from two different guns. The spent cases were found at different positions; the 9mm cases were grouped in the middle of the street, and the .40-caliber cases were grouped several addresses away, on the sidewalk.

In March 2005, Floyd gave a statement to investigators about Copeland's murder and testified before a grand jury. With Floyd on the stand at trial, the state introduced her grand jury testimony for impeachment purposes. Floyd told the grand jury that, around 9:00 pm on August 17, 2004, she was driving a car with Randall in the front passenger seat and Nelson and Armfield in the rear.

Floyd stated, after Randall spotted Copeland, he called his sister and asked her to retrieve a hooded sweatshirt and some urine bags[5] from his house. Floyd drove the trio to Randall's home. There, Randall's sister, Sinquis Prosper, brought the requested items to the car. Floyd observed Randall's sister cradling the sweatshirt with two hands.

Floyd informed the grand jury she then drove the defendants to the vicinity of Jenkins' home, where Randall watched Copeland drop off Jenkins and her children. Floyd witnessed Randall instruct Armfield and Nelson to "take care of business." Floyd understood this to mean Armfield and Nelson should shoot Copeland.

Armfield and Nelson exited the vehicle and headed toward Copeland. Floyd heard several gunshots and then saw Armfield and Nelson running back to her car. Armfield had a gun in his hand and Nelson was holding his side as if carrying a gun. They got back in Floyd's car. Armfield, complaining about Nelson's hesitancy, exclaimed: "[He] didn't want to shoot until I started to shoot."

Prosper testified at trial, too. She attested to the phone call and visit from her brother occurring shortly before 9:00 pm on August 17, 2004. She also confirmed Randall arrived in a car driven by Floyd, with Armfield and Nelson sitting in the rear. She gave Randall the requested sweatshirt and urine bags. Prosper told police and the grand jury the sweatshirt contained hard, heavy objects in its pockets. Though Prosper did not look inside the pockets, she believed they contained guns; she knew Randall kept guns in the house. The state

---

[5] For Randall's medical condition. He is paralyzed.

introduced Prosper's police statement and grand jury testimony for impeachment purposes.

Despite these accounts, the prosecution's case against Armfield did not go unchallenged. No physical evidence tied Armfield to either the 6:00 pm or the 9:00 pm shooting. No suitable latent fingerprints were left on any of the cartridge cases found at the murder scene. Police did confiscate a 9mm pistol after responding to a March 2005 shooting involving Armfield's codefendant, Nelson (more on that, below). Although forensic analysis matched that gun to the 9mm cartridge cases recovered from the murder scene, Armfield had nothing to do with the events surrounding the pistol's confiscation.

The state's witnesses had their share of credibility issues. Williams did not identify Armfield at the scene until he picked Armfield from a police photo lineup in April 2005—a full eight months after the shooting. Nor did he even recognize Armfield in the courtroom at trial. Williams also admitted to testifying while on heroin.

Vinson spoke to police the night of Copeland's murder, but he did not provide his full account until being charged with a felony firearm offense in March 2005. He received no promises for cooperating yet his gun charge was dismissed.

Prosper and Floyd each recanted at trial and told the jury they had been threatened by police to lie. Prosper testified the police and a state's attorney instructed her to falsely claim she felt heavy, hard objects in the sweatshirt, or else face jail. She claimed the entirety of her grand jury testimony was fabricated other than the fact that she delivered urine bags and a sweatshirt to her brother on August 17, 2004.

Floyd stated police gave her a bogus series of events to memorize and regurgitate before the grand jury. She purported to comply only after investigators threatened her with a first-degree murder charge and 12 years' imprisonment on three unrelated drug counts. Per Floyd's revised story, she and the three defendants spent the day Copeland died driving around smoking marijuana. Floyd confirmed the encounter with Prosper involving urine bags and a sweatshirt, but she denied everything else she had told police regarding Copeland's murder. She claimed those additional events did not happen. She also testified she could not remember what she told the grand jury, adding it was all a lie anyway.

Floyd and Prosper's claims of coercion conflicted with their grand jury testimony, in which they stated no promises or threats had been made in connection with their willingness to talk with investigators. The government also put on witnesses who denied Prosper and Floyd's accusations of threats from law enforcement. The jurors had the opportunity to weigh those rebuttals against the allegations. They knew of Prosper and Floyd's close relationships with Randall and could infer from them a motive to protect him. They also heard a portion of Floyd's grand jury testimony in which she explained Randall abused her and she was scared he could have her harmed or killed.

Armfield contends the flaws in the state's case made the question of his guilt a razor-thin call. The jury, after all, deliberated for nearly fourteen hours. At one point the jurors informed the judge they reached an impasse and had to be instructed to keep deliberating. He also points to the jury's conclusion that he did not fire a weapon during the murder as proof that it rejected evidence to the contrary, such as Vinson

and Floyd's accounts. Since the jury discredited those key witnesses, there was little left of the prosecution's case and the disclosed opening statements from Nelson's trial must have tipped the scale against him, he claims.

We disagree. First, that the jury determined Armfield did not discharge a weapon does not mean the jury rejected Vinson and Floyd's testimony entirely. Nor does the special verdict bear on Armfield's guilt for first-degree murder because he still faced accomplice liability. The jury found him guilty of that crime; he participated directly in bringing about Copeland's death. In other words, even if the jury discounted testimony that Armfield himself fired at Copeland, that does not elevate the disclosed summary of Nelson's confession automatically (or at all); the special verdict does not tell us whether the disclosure had a "substantial and injurious" influence on the jury's ability to find Armfield guilty of murder.

More significant is the weight of evidence against Armfield. Multiple unconnected witnesses corroborated the state's theory: Armfield acted as part of a three-man crew that tried to kill Copeland once, failed, tried again only hours later, and succeeded. Two bystanders placed him, along with Nelson and Randall, at the scene of the 6:00 pm attempt on Copeland's life. Two more witnesses—one bystander and one accomplice—confirmed Armfield and Nelson's roles as trigger men in the 9:00 pm shooting and additionally placed Randall at the scene. Physical evidence and an additional witness supported the two-shooter theory. Another witness identified all three men together, only minutes before the fatal shooting, when delivering them a sweatshirt containing what she believed to be guns. For all their personal credibility baggage, the witnesses' narratives were consistent in substance and

detail. Vinson's testimony and Floyd's grand jury statements were especially damning.

The trial evidence alone spanned almost 450 pages of transcript. Not once did the state discuss or even hint at Nelson's confession. Only during deliberations was Armfield's jury exposed to a summary of Nelson's confession—a summary lasting two sentences, made during opening statements (not evidence) in another trial, that revealed no new details about the murder. Review of the entire record leaves us with no "grave doubt" about harmlessness. The disclosure was inconsequential next to the evidence, and a "properly instructed jury would have arrived at the same verdict" absent the disclosure. *Czech*, 904 F.3d at 577. Armfield's Confrontation Clause claim warrants no habeas relief.

## B. Ineffective Assistance of Counsel

Armfield also maintains he received ineffective assistance of counsel because his trial attorney did not move to exclude evidence concerning a shooting that happened in March 2005. Armfield raised this claim in a collateral postconviction proceeding. The state appellate court denied him relief. Armfield now insists the state court unreasonably applied *Strickland* in concluding trial counsel's error did not prejudice his case.

At trial, Tykima Walker testified that on March 18, 2005, she drove her two children to the Cook County jail to visit one of the children's fathers. Three men in another vehicle, a Grand Prix, followed her. She identified one of them as Nelson. At some point along the way, they began shooting at her car. When Walker arrived at the jail, Nelson and another of the Grand Prix occupants exited their car and followed her inside.

Officer Frank Ramaglia responded to reports of a person with a gun in a white Grand Prix. He located the Grand Prix, parked. At this point, only one individual remained in the car: a *Calvin* Armfield—not our petitioner, Russell Armfield. Ramaglia testified he placed Calvin Armfield in custody and retrieved three firearms from the car: a .380-caliber machine pistol; a .40-caliber pistol; and a 9mm pistol. Forensic ballistics analysis determined the 9mm pistol had been used in Copeland's murder. The jury viewed all three guns while the prosecutor had Ramaglia verify chain of custody.

*Strickland v. Washington* provides the clearly established federal law for Armfield's ineffective assistance of counsel claim. 466 U.S. 668 (1984). Pursuant to *Strickland*, Armfield must show (1) counsel's performance "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Failure to prove either deficient performance or prejudice defeats a petitioner's claim. *Winfield*, 956 F.3d at 452.

For prejudice, a reasonable probability is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

The state appellate court did not address whether trial counsel performed deficiently under *Strickland*'s first prong. We need not address performance either if resolving the claim on prejudice will do. *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). But the state court indeed assessed prejudice, and our review is "doubly" deferential at this stage. *Richter*, 562 U.S. at 105.

Here, even if counsel's failure to object was sub-standard, that failure did not prejudice Armfield's case.

As with Armfield's briefing of harmlessness, much of his argument for prejudice rests on his view that the state brought a weak case against him. *See Strickland*, 466 U.S. at 696 ("[A] verdict … weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). Granted, the state's evidence against Armfield was not one-sided, but it was both robust and compelling. We discussed the evidence's strength (and shortcomings) in the preceding section and need not repeat ourselves.

In addition, Armfield highlights the Illinois Appellate Court's adoption of its earlier assessment of Armfield's case on direct appeal. On direct appeal, the state court incorrectly determined police recovered the 9mm pistol used in Copeland's murder from *petitioner*'s car, not that of Calvin Armfield. Armfield argues this mistake constitutes an unreasonable determination of fact that should result in habeas relief.

But nothing indicates the *jury* made that same mistake. Early on in closing arguments, while referring to Armfield and Randall, the prosecutor said "they" are so bold as to shoot up the area around the Cook County jail. That was technically incorrect; only Nelson took part in the shooting near the jail. Armfield and Randall had nothing to do with it. The misstatement, however, was minor, and we can find no prejudice resulting from it. Indeed, the prosecutor made sure to include Calvin Armfield's first name when later getting into the particulars of the March 2005 shooting, distinguishing that individual from petitioner. At one point, the prosecutor began to refer to Calvin Armfield as petitioner's brother. Defense

counsel objected and the judge sustained the objection, explaining, "There is no testimony about what relation the one bore to the other." Supp. App'x at 574. Given this context, there was little room for the jury to confuse the two. Nor was the jury likely to associate the .380- and .40-caliber guns recovered in March 2005 with Copeland's murder. Nothing linked those weapons to the fatal August 2004 shooting in any way, and the jury's exposure to them was momentary and procedural at most.

Relatedly, Armfield implies trial counsel's failure to object allowed the state to unfairly lump him in with "superpredators" brazen enough to shoot up an area with heavy law enforcement presence near the jail and courthouse. The prosecution didn't need to reference the March 2005 shooting for the jury to draw that conclusion. Armfield fit the bill thanks to his role in two shootings on the same day on the public streets of the same neighborhood.

The state appellate court did not apply *Strickland*'s prejudice test unreasonably. Considering the strength of the prosecution's evidence against the secondary value added by the March 2005 shooting, there exists no substantial likelihood of a different result here.

### III. Conclusion

The Illinois Appellate Court reviewed Armfield's conviction twice: once on direct appeal (his Confrontation Clause challenge), and again through collateral proceedings (his ineffective assistance of counsel challenge). In neither instance did the state court resort to an unreasonable analysis that would permit federal habeas relief. The state's case against Armfield was strong, with multiple, independent witnesses

swearing to the same events and implicating him as a key player in Al Copeland's murder. Thus, Armfield cannot overcome harmlessness or make a showing of prejudice, as required for his two claims. The district court's judgment is AFFIRMED.